IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| GREGORY DRUMWRIGHT, EDITH ANN JONES, and JUSTICE FOR THE NEXT GENERATION; )<br><br>Plaintiffs, )<br>vs. )<br><br>TERRY JOHNSON, in his official and individual capacities as Alamance County Sheriff, and MARY KRISTY COLE, in her official and individual capacities as Graham Chief of Police. )<br><br>Defendants. ) | Civ. No. _____<br><br>**COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND EMERGENCY DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs Reverend Gregory Drumwright, Edith Ann Jones, and Justice for the Next Generation, by and through counsel, file this complaint for injunctive relief and damages against Defendants Terry Johnson and Kristy Cole, and allege upon information and belief as follows:

## INTRODUCTION

1.      On October 31, the last day of early voting and same-day voter registration in North Carolina, and three days before the November 2020 General Elections, Defendants and their deputies and officers planned and orchestrated the violent dispersal of a peaceful and non-partisan march to a polling place in Graham, North Carolina. Participants in the "I Am Change March to the Polls" were physically injured when Defendants' deputies and officers used

1

pepper spray on peaceful marchers, including children, the elderly, and people with disabilities. Terrified by these actions and suffering the painful effects of pepper spray, many participants, including Plaintiff Jones, were unable to proceed to the polls that day. Multiple individuals, including Plaintiff Drumwright, in addition to suffering harm from the pepper spray, were unlawfully arrested by Defendants' deputies and officers. The Alamance County magistrate banned those arrested from returning to the City of Graham for 72 hours.

2.      Defendants' actions amplify the already charged atmosphere for voters in North Carolina. Defendants' deputies and officers, by planning and authorizing the excessive force against Plaintiffs and interfering with Plaintiffs' protected speech and assembly rights, have deprived Alamance County voters, including those who attended the October 31 "I Am Change" March to the Polls in Graham, and members of Plaintiff Justice for the Next Generation ("J4tNG") of their fundamental right to vote free from intimidation, harassment, threats, or other forms of coercion.

3.      Defendants' actions to suppress and violently disperse a peaceful assembly gathered for the express purpose of encouraging people to vote intimidates and discourages Plaintiff J4tNG's members and other march participants from voting. It has long been recognized that "voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takashi*, 504 U.S. 428, 433 (1992) (internal citation and quotations omitted). "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Courts have recognized "[v]oter intimidation presents an ongoing threat to the participation of minority individuals in the political process." *Democratic Nat'l Comm. v.*

2

*Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 578-79 (D.N.J. 2009), *aff'd* 673 F.3d 192 (3d Cir. 2012), *cert. denied* 133 S. Ct. 1471 (2013).

4.     By using excessive force and issuing unlawful orders to disperse, Defendants also violated Plaintiffs' First Amendment rights to freedom of speech, assembly, and association and also violated Plaintiffs Drumwright's and Jones' Fourth Amendment rights to be free from unreasonable seizures and excessive force.

5.     Plaintiffs Drumwright and J4tNG plan to hold a get-out-the-vote march in Graham on Election Day, November 3, 2020, and all Plaintiffs intend to continue to exercise their First Amendment rights to protest police violence and white supremacy in Graham and Alamance County -- including the Confederate monument in Graham's public square -- in the days and weeks ahead.

6.      J4tNG brings this action on its own behalf and on behalf of its individual and community group members, to put a stop to Defendants' actions that violate federal law.

**PARTIES**

7.  Plaintiff Gregory B. Drumwright is an adult Black resident of Guilford County, North Carolina, a Professor of Communications at High Point University, a community organizer and social justice activist, and Senior Minister of the Citadel Church in Greensboro. Rev. Drumwright is Lead Organizer of Plaintiff J4tNG, helped organize and led the "I Am Change" March to the Polls in Graham on October 31, 2020 and plans to lead a similar march on Election Day, November 3, 2020. He also led a demonstration to protest racialized policing and police brutality against Black people and communities, and to protest the Confederate

3

monument in Graham on July 11, 2020. He plans to continue to gather Alamance citizens and protest these same issues in Graham near the Historic Courthouse after the election.

8. Plaintiff J4tNG is an unincorporated association of community organizations organizing for racial justice and an end to police violence and other forms of systemic racial oppression. To fulfill that mission and purpose, Plaintiff JFtNG has organized and participated in "get out the vote" drives for the 2020 election in North Carolina and across the country. Defendants' unlawful acts on October 31 frustrate Plaintiff J4tNG's mission and purpose and has caused J4tNG to divert resources away from its other racial justice activities in order to prevent and guard against voter intimidation in Alamance County. Defendants' unlawful actions on October 31 also caused harm to Plaintiff J4tNG's individual and organizational members, particularly those voter members who reside in Alamance County.

9. Plaintiff Edith Ann Jones, who goes by Ann Jones, is an adult Caucasian resident of Graham North Carolina, is registered to vote within North Graham Precinct in Alamance County. Plaintiff Jones, a life-long resident of Alamance County, is a member of People for Change, which joined with Plaintiff J4tNG to help organize and participate in the October 31 "I Am Change" March to the Polls. Plaintiff Jones has protested police brutality and white supremacy, including the Confederate monument in Graham, and intends to continue to seek to exercise her First Amendment rights in Graham and Alamance County.

10. Defendant Terry S. Johnson ("Defendant Johnson" or "the Sheriff") is sued in his official capacity as Sheriff of Alamance County, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Defendant Johnson is the chief law enforcement officer of

4

Alamance County, and as such has authority to assign duties to sheriff's deputies and enforce local ordinances in effect throughout the county. *See* N.C. Gen. Stat. § 162-1 *et seq*.

11.     Defendant Kristy Cole ("Defendant Cole") is sued in her official capacity as Chief of the Graham Police Department (GPD), is domiciled in the state, and is subject to the personal jurisdiction of this Court. Defendant Cole has charge of the GPD and as such is authorized to assign duties to GPD officers and is responsible for seeing that GPD officers faithfully perform their duties. *See id.* Ch. 2, art. IV, div. 1, § 2-120.

## JURISDICTION AND VENUE

12.     Plaintiffs bring this action under 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and 52 U.S.C. § 10307(b) to redress the deprivation, under the color of state law, of rights secured by the United States Constitution.

13.     Plaintiffs have standing to enforce these rights and all rights asserted herein.

14.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under federal law, under 28 U.S.C. § 1343 because this action requests equitable or other relief under statues protecting the right to vote and civil rights.

15.     This Court has personal jurisdiction over Defendants as residents of North Carolina.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

17.     This Court has the authority to provide the emergency declaratory and injunctive

5

relief requested pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 42 U.S.C. § 1983, and 28 U.S.C. §§ 2201 and 2202.

18. The allegations herein justify injunctive relief in order to prevent irreparable harm to Plaintiffs.

## STATEMENT OF FACTS

### The Right to Vote Is Protected by Law.

19. The right to vote in an election is guaranteed by, *inter alia*, the First, Fourteenth, and Fifteenth Amendments to the United States Constitution.

20. The Ku Klux Klan Act of 1871 (the "Ku Klux Klan Act") was the last of the Enforcement Acts, passed during Reconstruction to protect the suffrage rights of formerly enslaved people and to protect them and their supporters from violence, intimidation, and harassment.

21. The Ku Klux Klan Act, 42 U.S.C. § 1985(3), provides for damages and equitable relief "if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of . . . an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy." 42 U.S.C. § 1985(3).

22. The Ku Klux Klan Act provides that an action will lie against the conspirators so long as "one or more persons engaged" in the conspiracy "do, or cause to be done, any act in furtherance of the object of such conspiracy." *Id.*

23. Even as to those persons who do not directly participate in those activities, the Ku

6

Klux Klan Act makes it unlawful to conspire with others to promote, organize, and otherwise facilitate those efforts.

24.    The Voting Rights Act also protects against intimidation in both elections and registration efforts. Section 11(b) of the Voting Rights Act prohibits actual or attempted "intimidation," "threats," or "coercion" against a person, either "for voting or attempting to vote" or "for urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307(b). Section 11(b) authorizes private suits against private actors, even in the absence of any action by a state or state official.  *Id.*

25.    Invasions of physical space and intimations of possible future violence, prosecution, or legal action based on a voter's presence at the polls constitute unlawful voter intimidation. *See, e.g., Ohio Democratic Party v. Ohio Republican Party*, 2016 WL 6542486, at *2 (N.D. Ohio Nov. 4, 2016) (entering a Temporary Restraining Order prohibiting voter intimidation activities); *Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 334 (E.D. La. 1965) (pattern of acts and threats of physical violence constituted intimidation of voter's attempt to exercise their civil rights); *United States v. Clark*, 249 F. Supp. 720 (S.D. Ala. 1965) (baseless arrests and prosecutions of black citizens seeking to vote and voter registration volunteers declared unlawful and violated voters right to vote).

26.    It is a federal crime, punishable by financial penalties and imprisonment, to intimidate voters in a presidential election.  18 U.S.C. § 594.

**<u>Notwithstanding Legislation and Enforcement Efforts, Voter Intimidation Remains A Problem</u>**.

27.    Despite significant legislation aimed at allowing people to register to vote and

7

cast their ballot without fear of actual or attempted intimidation, threats, or coercion, efforts to intimidate voters have persisted.

28.    In 2000, Black voters in Florida complained about police traffic stops on Election Day, according to a report by the U.S. Commission on Civil Rights.[1]  And in 2010, advocates raised concerns regarding voter suppression when North Carolina police set up traffic checkpoints between primarily Black apartment complexes and polling locations.[2] In 2016, within the first few hours of polls opening, over 4,000 reports of intimidation and suppression were called into the Election Protection hotline nationally.[3] These complaints included, for example, reports of a crowd aggressively confronting voters as they arrived at a polling location, causing some of them to leave before casting their ballot, and lines of cars with Confederate flags driving past polling locations.[4] As recently as 2018, voters in Georgia raised concerns of voter intimidation after police stopped groups of seniors were stopped on their way to the polls.[5]  In September 2020, a candidate's supporters were reported to have intimidated voters at a Fairfax County, Virginia early voting polling station.[6]

---

[1] U.S. Commission on Civil Rights, *Voting Irregularities in Florida During the 2000 Presidential Election* (2001), https://www.usccr.gov/pubs/vote2000/report/ch2.htm.
[2] Nancy McLaughlin and Joe Killian, *Dems, blacks question timing of checkpoint*, Greensboro News & Record, Nov. 2, 2010, https://greensboro.com/news/political/dems-blacks-question-timing-of-checkpoint/article_8ad13789-60e3-5520-bfb3-168dc58d5bdc.html.
[3] Alan Neuhauser, *Voter Intimidation Complaints Surge*, U.S. News & World Report, Nov. 8, 2016, https://www.usnews.com/news/politics/articles/2016-11-08/voter-intimidation-complaints-surge.
[4] *Id.*
[5] Astead Herndon, *Georgia Voting Begins Amid Accusations of Voter Suppression*, N.Y. Times, Oct. 19, 2018, https://www.nytimes.com/2018/10/19/us/politics/georgia-voter-suppression.html.
[6] Nick Corasaniti and Stephanie Saul, *Trump Supporters Disrupt Early Voting in Virginia*, N.Y. Times, Sept. 19, 2020, https://www.nytimes.com/2020/09/19/us/politics/trump-supporters-early-voting-virginia.html.

**Defendants' Violent Suppression of a March to the Polls Is Unlawful And Has Intimidated, Threatened, And Coerced Voters, Including Plaintiffs**.

29.     Plaintiffs are actively involved in community organizing, including mobilizing community members in Alamance County on racial justice and voting rights issues through exercise of their rights to speech and assembly.

30.     Plaintiff Drumwright (among others) sued Defendants Johnson and then Graham Police Chief Jeffrey Prichard (among others) on July 2, 2020 to enforce his First Amendment rights to speech and assembly on the streets of Graham, North Carolina. *See Peterman, et al, v. NAACP, Alamance Branch,* 1:20-cv-00613- CCE-LPA, Dkt. 1, Dkt. 27. In particular, Rev. Drumwright sought to enforce his rights to speak and assemble on the grounds of the Historic Courthouse square in Graham.

31.     On July 6, 2020, this Court entered a consent Temporary Restraining Order restraining Graham and Alamance county officials from enforcing a Graham City ordinance prohibiting more than two people from protesting in Graham without a permit. Dkt. 15. Graham's City Council subsequently repealed the ordinance on July 14, Dkt. 27-1, and on August 14, this Court later entered a preliminary injunction enjoining Alamance County officials from prohibiting all protests on many spaces in and around the Historic Courthouse. Dkt. 63.

32.     On Saturday, July 11, 2020, Reverend Drumwright led a peaceful march in the City of Graham to protest police brutality and white supremacy. He applied for and received permission from the City of Graham, the NC Department of Transportation, and Alamance County officials to lead his march in NC Hwy 87 from Burlington to the Confederate

monument located in Graham's Historic Courthouse Square for a rally in front of the monument at the junction of North Main Street and Court Square, the rotary which circles the Historic Courthouse. Among other things, he was granted permission to erect a stage in the street and use a public address ("PA") system powered by a generator.

33.     On or about August 21 in response to this Court's August 14 preliminary injunction, Alamance County introduced a "facility use policy" which laid out rules for large groups wishing to use the Historic Courthouse grounds and a permit process.

34.     On October 8, Reverend Drumwright wrote the City of Graham to announce his plans for a non-partisan march to the polls focused on racial justice issues from 11 AM- 2 PM on Saturday, October 31 and to request the City's permission for the planned march. On October 11, Defendant Cole responded that, due to the City's current lack of a permitting system, Reverend Drumwright was required to appear at the next City Council meeting to request authorization for his march plans.

35.     Reverend Drumwright attended the City's October 13 Council meeting to request authorization for the march plans. In both his October 8 letter and at the Council meeting, he explained that he intended to conduct the October 31 march to the polls as he had the July 11 event.

36.     As described in his permit application and in various subsequent (including in-person) communications with Defendants between October 9 and October 30, the only logistical differences between the July 11 and October 31 events were that the October 31 march was to end at East Elm Street Early Voting location, with the rally (including speaker presentations from a small stage using a PA system) to occur on the Historic Courthouse North

10

entrance landing, steps, sidewalks and pedestrian area next to the Confederate monument. Rev. Drumwright requested authorization to erect a stage at the end of North Main as he had been allowed to do on July 11and requested short-term closure of the rotary area at the north end of the Historic Courthouse. On October 20, he also applied for and received a permit from the County to utilize the Historic Courthouse grounds on October 31.

37.     At its October 13 meeting, Graham's attorney instructed the City Council that it had no authority to act on Rev. Drumwright's requests. The Council advised Rev. Drumwright to coordinate logistics for the march and rally with Defendant Cole. In addition to the written communications with Defendant Cole, Rev. Drumwright met with Defendant Cole in person on October 20 to discuss the route, stage and street closure needs. Defendant Cole told Rev. Drumwright she would not close any streets or allow a stage as had been done on July 11.

38.     On Friday, October 30, Rev. Drumwright, with counsel present, met again with Defendants to try to ensure marchers' safety the following day. Defendant Cole again refused any street closures and refused to authorize the stage in the same location it had been on July 11, but gave no reason for the denial other than that the City Council had not authorized it. The County attorney agreed that Rev. Drumwright could put his stage on the Courthouse grounds.

39.     On Saturday morning, October 31, a group of about 200-250 people gathered at Wayman Chapel AME Church in Graham, North Carolina for a walk to the polls. Defendant Cole met the marchers and Plaintiffs in the parking lot near the chapel, stated that she would be closing the street for them to march all the way to the Historic Courthouse grounds, and told them that she had State troopers there to "help close the streets," and added, "the street is yours."

11

40.     Rev. Drumwright spoke to those assembled, reminding them before the march began to spread out and keep their nose and mouth coverings on in compliance with COVID-19 social distancing protocols.

41.     The group of participants included the Mayor of Burlington, NC as well as candidates for county commissioner and school board.

42.     The March commenced around 11 AM, as participants, including small children and senior citizens, proceeded from Wayman's Chapel AME Church up North Main Street towards the Confederate monument that fronts the north side of the Historic Courthouse. During that time, marchers were permitted to walk in the road and were escorted by Graham police, as provided in Defendant Cole's October 28 Letter and as stated by Defendant Cole to Plaintiffs in the parking lot just before the march began .

43.     When marchers peacefully passed through the intersection of Hardin Street on North Main, about a block from the Confederate monument and Historic Courthouse, Rev. Drumwright asked them to halt so that he could explain the significance of the space they were about to enter. State Highway Police who were escorting the march from the rear in their patrol cars blocked North Main, and the Graham Police cars that had escorted the march from the front pulled around the Court Square and stopped near the corner of East Elm street, beside Passion Fusion Grill.

44.     As he had done since the march began, Rev. Drumwright spoke to the marchers using his portable PA system, powered by a small portable generator. He gave a short speech about Wyatt Outlaw, the first Black elected city official of Graham who was lynched by white supremacists with assistance from local police in 1870, in what the City calls Sesquintennial

12

Square but which Plaintiffs call Wyatt Outlaw Memorial Park ("Wyatt Outlaw Park"), on the northeast corner across from the Historic Courthouse. Then George Floyd's niece addressed the marchers briefly.

45. The participants then remained still and silent for 8 minutes and 46 seconds in symbolic remembrance of the 8 minutes and 46 seconds that George Floyd was pinned to the ground by a police officer's knee on his neck, killing Mr. Floyd. Spread out in compliance with COVID-19 protocol, the more than 250 participants were kneeling, standing, sitting or lying face down in the section of North Main street and Court Square that was temporarily closed to traffic by the law enforcement vehicles.

46. Plaintiff Jones was kneeling with others in the crosswalk that runs from North Main alongside the Confederate monument to the courthouse north entrance.

47. There was a row of Sheriff deputies at top of the steps in front of the north Courthouse's entrance, and snipers on top of the building with their guns out pointed at the marchers.

48. Immediately upon the end of that period of silence, Rev. Drumwright told the crowd to wait for a moment while he put up the stage. Rev. Drumwright and several J4tNG members then began erecting the small stage where Defendant Johnson's deputies (standing at the top of the steps of the Courthouse in front of its North entrance) instructed them: in the crosswalk/pedestrian area adjacent to the Confederate monument which, since August 21, Defendant Johnson's deputies had referred to as a "safe zone" open to protestors under the Facility Use Policy.

49. Within seconds, suddenly and without warning, Graham Police suddenly and

13

without any warning or prior order of dispersal, began spraying the marchers -- many of whom, because of age or disability, were still making their way to their feet -- with pepper spray.

50.    Plaintiff Jones instantly felt her eyes and nostrils burning. She smelt a horrible odor from the spray. She turned and warned marchers behind her to move back.

51.    Rev. Drumwright began talking to the crowd in a calming voice and saying to Defendant Cole's officers that they had just sprayed children and elderly, peaceful people.

52.    At that point, Plaintiff J4tNG members and other marchers who had been at the Wyatt Outlaw Park were trying to use the crosswalk to get to the courthouse grounds, and Defendant Cole's officers stopped them and started to arrest them.

53.    Rev. Drumwright stepped down from the stage to de-escalate the situation and make sure the J4tNG members and marchers could cross the street and get to the Courthouse grounds. Rev. Drumwright then brought on the first speaker, Burlington's Mayor, followed by several other speakers.

54.    Just before 1:00pm, one of Defendant Johnson's deputies attempted, without giving warning, to disconnect and remove the generator that served as the power source for rally attendees' sound amplification system. Rev. Drumwright approached the deputy to ask why the officer was removing his property.

55.    Suddenly and again with no warning or dispersal order, Defendants' officers and deputies begin deploying pepper spray on the marchers.

56.    Marchers screamed and tried to get away. Plaintiff Jones saw one of Defendant Johnson's deputies spraying while a disabled, elderly African American woman in a mobility scooter was convulsing with seizures. Defendants' officers stood nearby and took no steps to

14

help her.

57. Easy access to most sidewalk areas around the square were blocked by city-erected barricades.

58. Graham Police officers began shouting at marchers to disperse, and without providing marchers adequate time to disperse, began dispensing large volumes of pepper spray into the crowd, even as marchers tried to leave the area.

59. Defendant Cole's deputies blocked off the street leading to the nearest early voting location, on Elm Street, effectively preventing marchers from proceeding to that polling site and otherwise fleeing the pepper spray.

60. As many marchers attempted to disperse by taking North Main Street, they were sprayed repeatedly with pepper spray by Defendants' officers, causing their eyes and noses to burn and water so much they could not walk or see for a period of time.

61. Among the victims of Defendant Johnson's deputies' pepper spraying were a three-year-old, who vomited. Defendant Johnson's deputies also sprayed pepper spray at a five-year-old and an eleven-year-old, causing both to vomit.

62. Defendants' officers and deputies arrested twenty people, including two poll observers and an Alamance News reporter covering the events.

63. Parts of the events were captured on video, available at https://www.newsobserver.com/news/local/article246861942.html.

64. The video shows an older man being restrained by three police officers (0:52-1:07), as well as a man with a camera being restrained by two police officers and then approached by two additional police officers who tried to pry his camera from his hands (1:14-

15

1:25).

65.     In the video, protesters say to a police officer, "You sprayed a kid," and the police officer responds, "I did," (1:25-1:28).

66.     The video also shows a police officer shouting "Get moving, you f-g pricks" as he sprays pepper spray at protesters while they try to walk away along a sidewalk.

67.     Because of Defendants' conduct, the planned march to the polls was abruptly terminated. Some voters, including Plaintiff Jones were actually deterred from voting. Because of Plaintiff Jones's pepper spray related injuries, she could not go to the polls that day as planned.

68.     Plaintiff J4tNG has dozens of members who are lawfully registered voters in Alamance County, who attended the march and are likely to also be similarly intimidated from voting by Defendants' violent actions. Therefore, other members of Plaintiff J4tNG are likely to experience both intimidation and an attempt to intimidate, threaten, and coerce such that they will be prevented from exercising their right to vote.

69.     Defendants Cole and Johnson and their deputies acted in concert to plan and engage in violent "crowd control" tactics against a march of voters to the polls. These activities constitute an attempt to intimidate, threaten, and coerce citizens, like Plaintiff Jones and members of Plaintiff J4tNG who are Alamance County voters, from participating in the election in a manner that prevents them from exercising their constitutional right to vote and from encouraging others to do so.

70.     Despite Defendants' claims that their actions were taken for "crowd control" purposes, their actions had the actual consequence of harassing, threatening, and intimidating

16

voters and peaceful marchers.

71.     Since October 31, Defendants have been unrepentant, insisting through spokespersons that their departments' violent actions were appropriate and justified.

72.      Defendants' violent suppression of Plaintiffs' rights to assemble for a march to the polls constitutes an attempt to intimidate, threaten, and coerce voters such as Plaintiff Jones and Plaintiff J4tNG's Alamance County voter members in an attempt to prevent and discourage them from exercising their right to vote.

73.     The above-referenced conduct violates Section 11(b) of the Voting Rights Act, the Ku Klux Klan Act, and the First and Fourteenth Amendments. These violations have caused Plaintiff Jones and J4tNG members who are lawfully entitled to vote in Alamance County irreparable harm and will continue to do so absent preliminary and permanent injunctive relief.

74.     Individual Plaintiffs and members of J4tNG intend to participate in future non-violent protests in Graham, including in the Historic Courthouse area.

75.     As a result of Defendants' unlawful actions, Plaintiffs have also suffered damages, including significant physical, emotional, and mental pain and suffering.

76.     Defendants' actions violated Plaintiffs' clearly established rights, of which a reasonable person would have known.

17

## CAUSES OF ACTION

### Count I: Violation of the First Amendment (all Plaintiffs against all Defendants)

77.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

78.     Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violation of the free expression, free association, and assembly rights protected under the First and Fourteenth Amendments to the U.S. Constitution. Plaintiff J4tNG asserts this claim on behalf of itself and its members.

79.     In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

80.     As described above, Defendants' activities to restrict and suppress Plaintiffs' speech and assembly in relations to the October 31 march, including their use of unlawful dispersal orders, unlawful arrests, and use of pepper spray to forcibly disperse those marching to the polls, violates Plaintiffs' First Amendment rights.

### Count II: Violation of the Fourth Amendment (all Plaintiffs against all Defendants)

81.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

82.     Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violation of their rights against unreasonable searches and seizures protected under the Fourth and Fourteenth Amendments to the U.S. Constitution. Plaintiff J4tNG asserts this claim on behalf of itself and its members.

18

83. In the following paragraphs, references to the Fourth Amendment include the Fourth Amendment as applied to the states through the Fourteenth Amendment.

84. As described above, Defendants' use of pepper spray to forcibly disperse those marching to the polls unreasonably seized Plaintiffs and violated their Fourth Amendment rights.

**Count III: Violation of Section 11(b) of the Voting Rights Act (Plaintiff Jones and J4tNG against all Defendants)**

85. Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

86. Section 11(b) of the Voting Rights Act provides that:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of Title 42.

52 U.S.C. § 10307.

87. Defendants violated Section 11(b) of the Voting Rights Act by suppressing, through unlawful dispersal orders and use of pepper spray, the efforts of Plaintiff Jones and other voters to march to the polls.

88. These actions intimidated, threatened or coerced, and/or attempted to intimidate, threaten, or coerce eligible Alamance County voters concerned about racial justice issues.

89. Defendants' violent conduct would intimidate or attempt to intimidate an objectively reasonable individual and did in fact prevent Plaintiff Jones and other voters from exercising their constitutional right to vote on the last day of the early voting period.

19

90.     Absent injunctive relief, these Plaintiffs will suffer irreparable harm and have no adequate remedy at law.

**Count IV: Ku Klux Klan Act of 1871 (Plaintiff Jones and J4tNG against all Defendants)**

91.     Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth in this claim.

92.     Plaintiff Jones and J4tNG bring a claim under the second clause of 42 U.S.C. § 1985(3), which provides that:

> [I]f two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

93.     Defendants violated 42 U.S.C. § 1985(3) by knowingly conspiring with each other to unlawfully disperse a march to the polls, with the purpose of discouraging and intimidating voters from exercising their constitutional right to vote.

94.     Defendants' deployment of their officers, coordination regarding use of pepper spray, and detention and arrest of attendees, constituted substantial steps in furtherance of the conspiracy.

95.     Defendants knew or should have known at the time of their actions that such acts would prevent or deter constitutionally eligible voters like Plaintiff Jones and members of Plaintiff J4tNG from exercising their right to vote in upcoming elections.

20

96.     Defendants' actions would intimidate or attempt to intimidate an objectively reasonable individual because discourage or prevent voters like Plaintiff Jones and members of Plaintiff J4tNG from exercising their constitutional right to vote.

97.     Absent injunctive relief, Plaintiff Jones and members of Plaintiff J4tNG will suffer irreparable harm.  Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant the following relief:

(a)  Preliminarily and permanently enjoin, and enter a declaratory judgment stating that Defendants' unlawful dispersal orders and use of pepper spray against peaceful marchers, especially those engaged in marching to the polls, violates all Plaintiffs' rights to free speech and assembly under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution, and Plaintiffs' rights under Section 11(b) of the Voting Rights Act, and 42 U.S.C. §1985;

(b)  Award Plaintiffs their damages, including punitive damages;

(c)  Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920 and as otherwise permitted by law; and

(d)  Order such other relief as this Court deems just and equitable.

21

Respectfully submitted this 2nd day of November,

/s/ Kristi L. Graunke
  Kristi L. Graunke
  North Carolina Bar No. 51216
  kgraunke@acluofnc.org
  Daniel K. Siegel
  North Carolina Bar No. 46397
  dsiegel@acluofnc.org
  Jaclyn Maffetore
  North Carolina Bar No. 50849
  jmaffetore@acluofnc.org
  ACLU of North Carolina
  P. O. Box 28004
  Raleigh, NC 27611-8004
  Tel: 919-834-3466

/s/ Elizabeth Haddix
Elizabeth Haddix
North Carolina Bar No. 25818
ehaddix@lawyerscommittee.org
Mark Dorosin
North Carolina Bar No. 20935
mdorosin@lawyerscommittee.org
Lawyers' Committee for Civil Rights Under Law
P.O. Box 956
Carrboro, NC 27510
Tel. 919-914-6106

/s/ Jason L. Keith
Jason L. Keith *Counsel for Plaintiffs*
North Carolina Bar No:34038
Keith & Associates, PLLC
241 Summit Avenue,
Greensboro, NC 27401