**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| JUSTICE FOR THE NEXT GENERATION, ALAMANCE ALLIANCE FOR JUSTICE, GREGORY B. DRUMWRIGHT, EDITH ANN JONES, QUENCLYN ELLISON, M.E., by and through her guardian Quenclyn Ellison, Z.P., by and through his guardian Quenclyn Ellison, FAITH COOK, MELANIE MITCHELL, J.A., by and through her guardian Melanie Mitchell, B.A., through her guardian Melanie Mitchell, JANET NESBITT, ERNESTINE LEWIS WARD, EDITH WARD, AVERY HARVEY, ASHLEY REED BATTEN, COREY MOORE, JASMINE BREEDEN, and BRENDEN KEE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| *Plaintiffs*, | ) | **Civil Action No. 1:20-cv-00998** |
| | ) | |
| v. | ) | |
| | ) | |
| TERRY S. JOHNSON, individually and in his official capacity as Sheriff of Alamance County, CLIFF PARKER, individually and in his official capacity as Chief Deputy of the Alamance County Sheriff's Office ("ACSO"), BARBARA TOMEY, individually and in her official capacity as Corporal of the ACSO, CHAD MARTIN, individually and in his official capacity as Lieutenant of the ACSO, DANIEL NICHOLS, individually and in his official capacity as a Deputy of the ACSO, JAMES R. McCLELLAND, individually and in his official capacity as a Deputy of the ACSO, RANDY | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |

1

DENHAM, individually and in his ) official capacity as a Captain in the ) ACSO, DAVID SYKES, individually ) and in his official capacity as a Captain ) in the ACSO, CHIP COBB, ) individually and in his official capacity ) as a Sergeant in the ACSO, PETER ) TRIOLO, individually and in his ) official capacity as a Deputy in the ) ACSO, JOHN STRICKLAND, ) individually and in his official capacity ) as a Deputy in the ACSO, MARK ) JOHNSON, individually and in his ) official capacity as a Deputy in the ) ACSO, JASON TEAGUE, individually ) and in his official capacity as a Deputy ) in the ACSO, MARK DOCKERY, ) individually and in his official capacity ) as a Deputy in the ACSO, BRANDON ) KILMER, individually and in his ) official capacity as a Deputy in the ) ACSO, CHANDLER WEGER, ) individually and in his official capacity ) as a Deputy in the ACSO, JAMES R. ) McVEY, individually and in his official ) capacity as a Sergeant in the ACSO, ) TAYLOR HOPKINS, individually and ) in his official capacity as a Deputy in ) the ACSO, JONATHAN R. FRANKS, ) individually, MARY KRISTINE ) COLE, individually and in her official ) capacity as Chief of Police for the ) Graham Police Department ("GPD"), ) JOAQUIN VELEZ, individually and in ) his official capacity as Patrol ) Operations Lieutenant for the GPD, ) DUANE FLOOD, individually and in ) his official capacity as Support ) Services Captain for the GPD, ) RODNEY KING, individually and in ) his official capacity as Assistance Chief ) of Police for the GPD, JUSTIN )

2

HOPKINS, individually and in his ) 
official capacity as an Officer for the ) 
GPD, NOAH SAKIN, individually and ) 
in his official capacity as an Officer for ) 
the GPD, SCOTT NEUDECKER, ) 
individually and in his official capacity ) 
as an Officer for the GPD, ERIC ) 
JORDAN, individually and in his ) 
official capacity as an Officer for the ) 
GPD, ROBERT PARKS, individually ) 
and in his official capacity as an Officer ) 
for the GPD, JOSHUA PAYNE, ) 
individually and in his official capacity ) 
as an Officer for the GPD, JOHN ) 
WAY, individually and in his official ) 
capacity as an Officer for the GPD, ) 
KEITH KIRKMAN, individually and ) 
in his official capacity as an Officer for ) 
the GPD, CHAD BOGGS, individually ) 
and in his official capacity as an Officer ) 
for the GPD, CHRISTOPHER ) 
DENNY, individually and in his ) 
official capacity as an Officer for the ) 
GPD, BRANDON LAND, individually ) 
and in his official capacity as an Officer ) 
for the GPD, and the City of Graham, ) 
                                        ) 
*Defendants.*                           ) 
                                        ) 

## PLAINTIFFS' REVISED SECOND AMENDED COMPLAINT

In accordance with the Court's January 5, 2022 Order, Plaintiffs Justice 4 the Next Generation (J4tNG), Alamance Alliance 4 Justice (AA4J), Reverend Gregory Drumwright, Edith Ann Jones, Faith Cook, Janet Nesbitt, Quenclyn Ellison on behalf of herself and her minor children, M.E. and Z.P., Melanie Mitchell, on behalf of herself and her minor children J.A. and B.A., Ernestine Lewis Ward, Edith Ward, Avery Harvey, Ashley Reed

3

Batten, Corey Moore, Brenden Kee, and Jasmine Breeden, by and through counsel, file this revised second amended complaint for injunctive and declaratory relief and damages pursuant to Fed. R. Civ. P. 15 (a)(2) against Defendants Terry Johnson, Cliff Parker, Randy Denham, David Sykes, Chip Cobb, Jonathan Franks, Barbara Tomey, Chad Martin, Daniel Nichols, James R. McClelland, Peter Triolo, Chandler Weger, James McVey, Taylor Hopkins, Mark Johnson, Brandon Kilmer, Jason Teague, John Strickland, Mark Dockery, Mary Kristine Cole, Joaquin Velez, Duane Flood, Eric Jordan, Robert Parks, Justin Hopkins, Joshua Payne, John Way, Brandon Land, Christopher Denny, Noah Sakin, Keith Kirkman, Chad Boggs, Scott Neudeker, and the City of Graham, and allege as follows:

## INTRODUCTION

1.     On October 31, 2020, the last day of early voting and same-day voter registration in North Carolina, and three days before the November 2020 General Election, Plaintiffs J4tNG, AA4J, Drumwright, Jones, Cook, Nesbitt, Ellison, M.E., Z.P., Mitchell, J.A., B.A., Ernestine Ward, Edith Ward, Harvey, Batten, Moore, Kee, and Breeden, along with other members of the community, attempted to participate in a peaceful, non-partisan march to the West Elm Street early voting site in Graham, North Carolina. The purpose of the march was to encourage individuals in the community to register to vote, and cast their vote, in the upcoming election. The march, referred to as "I am Change March to the Polls" ("the March" or "March to the Polls"), also presented Plaintiffs, and others in the community, with the opportunity to express their dissatisfaction with acts of social and racial injustice they had experienced and/or witnessed.

4

2.      However, the March to the Polls abruptly and prematurely concluded when certain Alamance County Sheriff's deputies and certain City of Graham police officers, at the instruction and with the approval of their supervisors, indiscriminately and unlawfully used pepper spray on peaceful marchers, including children, the elderly, and people with disabilities. Terrified by these actions and suffering the painful effects of pepper spray, many participants, including Plaintiffs Jones, Harvey, and Batten, could not vote that day. Plaintiff Harvey could not vote at all in the 2020 election because Defendants' actions precluded him from registering on October 31st.

3.      This wrongful conduct, experienced by each Plaintiff, violated Plaintiffs' right to engage in peaceful protest and to be free from objectively unreasonable force from law enforcement authorities It also deprived Plaintiffs Drumwright, Jones, Cook, Nesbitt, Ellison, Mitchell, Ernestine Ward, Edith Ward, Harvey, Batten, Moore, Kee, and Breeden, as well as members of Plaintiffs J4tNG and AA4J, of their fundamental right to vote free from intimidation, harassment, threats, or other forms of coercion.

4.      As further detailed below, by using excessive force, improperly responding to a peaceful march with pepper spray, issuing unlawful orders to disperse, and making unlawful arrests, Defendants King, Jordan, Parks, J. Hopkins, Payne, Way, Land, Denny, Sakin, Kirkman, Boggs, Neudeker, Tomey, Martin, Nichols, McClelland, Triolo, Weger, McVey, T. Hopkins, M. Johnson, Kilmer, Teague, Strickland, and Dockery, violated all Plaintiffs' First Amendment rights to freedom of speech, assembly, and association, and also violated the Fourth Amendment rights of Plaintiffs Drumwright, Kee, Moore,

5

Breeden, Jones, Ellison, M.E., Z.P., Cook, Mitchell, J.A., B.A., Nesbitt, Ernestine Ward, Edith Ward, Harvey and Batten (hereinafter "Individual Plaintiffs") to be free from excessive force. And by planning, directing, approving, and/or ratifying those unlawful acts, Defendants Franks, Cole, Velez, Flood, King, the City of Graham, T. Johnson, Parker, Denham, Sykes, and Cobb violated all Plaintiffs' First Amendment rights to freedom of speech, assembly, and association, and also violated the Fourth Amendment rights of the Individual Plaintiffs to be free from excessive force. Defendants' action caused substantial damages to Plaintiffs.

5.     Plaintiffs have continued—and intend to continue—to exercise their First Amendment rights to protest police violence and white supremacy, and to encourage voter and other civic participation in Graham and Alamance County in the weeks, months, and years ahead but continue to face hostility and excessive uses of force by those working for, or affiliated with, the Alamance County Sheriff's Office and City of Graham, necessitating declaratory and injunctive relief for the civil rights violations plead in this action.

## PARTIES

6.     Plaintiff J4tNG is an unincorporated association of community organizations organizing for racial justice and an end to police violence and other forms of systemic racial oppression. To fulfill that mission and purpose, Plaintiff J4tNG and its members organized and participated in "get out the vote" drives for the 2020 election in North Carolina and across the country. Plaintiff J4tNG was the lead organizer and sponsor of the March in Graham, North Carolina on October 31, 2020. The unlawful actions identified in these

6

pleadings that occurred during and relating to the March frustrate Plaintiff J4tNG's overall mission and purpose, as well as that of the March itself—to encourage its members and other attendees to vote by marching to the West Elm early voting polling place.

7. These unlawful acts have also caused J4tNG to divert resources away from its other racial justice activities in order to prevent and guard against voter intimidation in Alamance County. For example, J4tNG organized the November 3 "We're Ready 4 Change" march to complete the March to the Polls that was abruptly and prematurely halted on October 31st. The unlawful actions on October 31st also caused harm to Plaintiff J4tNG's individual and organizational members. Plaintiff J4tNG brings claims in this action on behalf of itself and its members.

8. Plaintiff AA4J is an unincorporated membership organization of Alamance County community leaders, parents, grandparents, and youth with the mission of connecting with like-minded individuals and organizations to empower their voices where it pertains to racism, injustice, and oppression. AA4J fights for political, educational, social, and economic equality for all citizens of Alamance County and provides platforms to educate residents on issues relating to systemic injustice and racism while promoting social reforms. To fulfill its mission, AA4J members participate in activities to encourage voting, such as voter registration drives and the October 31 March. AA4J assisted Plaintiff J4tNG's organizing efforts for the October 31 March.

9. The unlawful actions identified in these pleadings that occurred during and relating to the March frustrated Plaintiff AA4J's mission, caused harm to its members, and

7

frustrated the purpose of the March itself—to encourage AA4J members and other attendees to vote by marching to the West Elm early voting polling place. For example, as a result of the actions identified in these pleadings, AA4J helped organize the November 3 "We're Ready 4 Change" march to complete the March to the Polls derailed by Defendants on October 31, 2020.

10. Plaintiff Gregory B. Drumwright is a Black resident of Guilford County, North Carolina, a Professor of Communications at High Point University, a community organizer and social justice activist, and the Senior Minister of the Citadel Church in Greensboro. He is the Lead Organizer of Plaintiff J4tNG. Plaintiff Drumwright helped organize and led the March on October 31, 2020. He will continue to gather Alamance residents and organize rallies, marches, and protests related to these same issues in Graham and Alamance County in the coming months and years. As further explained below, Plaintiff Drumwright was injured by the unlawful actions identified in these pleadings that occurred during and relating to the March.

11. Plaintiff Brenden Kee is a Black resident of Greensboro, North Carolina. He is a member of J4tNG. Plaintiff Kee has protested police brutality and white supremacy in Graham and Alamance County, and plans to continue doing so. Plaintiff Kee attended the March. He was injured by the unlawful actions identified in these pleadings that occurred during and relating to the March, including the unlawful use of pepper spray during the March. Plaintiff Kee was also injured during the course of his arrest by GPD officers and ASCO deputies following the unlawful dispersal of the March.

12.     Plaintiff Corey Moore is a Black resident of Greensboro, North Carolina. He is a member of J4tNG. Plaintiff Moore has protested police brutality and white supremacy in Graham and Alamance County, and plans to continue doing so. Plaintiff Moore attended the March. As further explained below, he was injured by the unlawful actions identified in these pleadings that occurred during and relating to the March, including the unlawful use of pepper spray during the March.

13.     Plaintiff Jasmine Breeden is a Black resident of Greensboro, North Carolina. She is a member of J4tNG. Plaintiff Breeden has protested police brutality and white supremacy in Graham and Alamance County, and plans to continue doing so. Plaintiff Breeden attended the March. As further explained below, she was injured by the unlawful actions identified in these pleadings that occurred during and relating to the March, including the unlawful use of pepper spray during the March.

14.     Plaintiff Edith Ann Jones, who goes by Ann Jones, is a white resident of Graham, North Carolina. She is registered to vote in Alamance County and is a life-long resident of Alamance County. Plaintiff Jones has protested police brutality and white supremacy in Graham and Alamance County, and plans to continue doing so. Plaintiff Jones attended the March and intended to go vote with other attendees at the West Elm Street early voting polling place on October 31. As further explained below, she was injured by the unlawful actions identified in these pleadings that occurred during and relating to the March, including the unlawful use of pepper spray during the March. As a result of these unlawful actions, she was unable to vote on October 31.

9

15.     Plaintiff Quenclyn Ellison is a Black resident of Burlington, North Carolina. She is registered to vote in Alamance County. Plaintiff Ellison is the President of AA4J, which joined with Plaintiff J4tNG to help organize and participate in the March. Plaintiff Ellison has protested police brutality and white supremacy in Graham and Alamance County, and plans to continue doing so. Plaintiff Ellison attended the March to the Polls. As further explained below, she was injured by the unlawful actions identified in these pleadings that occurred during and relating to the March, including the unlawful use of pepper spray during the March. Plaintiff Ellison is a parent and guardian of minors M.E. and Z.P., and brings suit on their behalves pursuant to Fed. R. Civ. P. 17(c)(1)(A), as well as her own behalf.

16.     Plaintiff M.E. is a minor and  the daughter of Plaintiff Ellison. Plaintiff M.E. attended the October 31 March and, as further explained below, was injured by the unlawful actions identified in these pleadings that occurred during and relating to the March, including the unlawful use of pepper spray during the March. Her mother, Plaintiff Ellison, asserts claims on M.E.'s behalf pursuant to Fed. R. Civ. P. 17(c)(1)(A).

17.     Plaintiff Z.P. is a minor and the son of Plaintiff Ellison. Plaintiff Z.P. attended the October 31 March and, as further explained below, was injured by the unlawful actions identified in these pleadings that occurred during and relating to the March, including the unlawful use of pepper spray during the March. His mother, Plaintiff Ellison, asserts claims on Z.P.'s behalf pursuant to Fed. R. Civ. P. 17(c)(1)(A).

18.     Plaintiff Faith Cook is a Black resident of Graham, North Carolina. She is registered to vote in Alamance County. Plaintiff Cook has protested police brutality and white supremacy in Graham and Alamance County, and plans to continue doing so. Plaintiff Cook attended the March to the Polls. As further explained below, she was injured by the unlawful actions identified in these pleadings that occurred during and relating to the March, including the unlawful use of pepper spray at the March.

19.     Plaintiff Melanie Mitchell is a white resident of Graham, North Carolina. She is registered to vote in Alamance County. Plaintiff Mitchell has protested police brutality and white supremacy in Graham and Alamance County and plans to continue doing so. Plaintiff Mitchell attended the October 31 March. As further explained below, she was injured by the unlawful actions identified in these pleadings that occurred during and relating to the March, including the unlawful use of pepper spray during the March. Plaintiff Mitchell is a parent and guardian of minors J.A. and B.A., and brings suit on their behalves pursuant to Fed. R. Civ. P. 17(c)(1)(A) as well as on her own behalf.

20.     Plaintiff J.A. is a minor and the daughter of Plaintiff Mitchell. Plaintiff J.A. attended the October 31 March and, as further explained below, was injured by the unlawful actions identified in these pleadings that occurred during and relating to the March, including the unlawful use of pepper spray during the March. J.A.'s mother, Plaintiff Mitchell, asserts claims on J.A.'s behalf pursuant to Fed. R. Civ. P. 17(c)(1)(A).

21.     Plaintiff B.A. is a minor and the daughter of Plaintiff Mitchell. Plaintiff B.A. attended the October 31 March and, as further explained below, was injured by the

Case 1:20-cv-00998-CCE-LPA   Document 71   Filed 01/31/22   Page 11 of 73

unlawful actions identified in these pleadings that occurred during and relating to the March, including the unlawful use of pepper spray during the March. B.A.'s mother, Plaintiff Mitchell, asserts claims on B.A.'s behalf pursuant to Fed. R. Civ. P. 17(c)(1)(A).

22.     Plaintiff Janet Nesbitt is a Black resident of Graham, North Carolina. She is registered to vote in Alamance County. Plaintiff Nesbitt has a disability and uses an electric scooter to move around. Plaintiff Nesbitt has protested police brutality and white supremacy in Graham and Alamance County, and plans to continue doing so. Plaintiff Nesbitt attended the October 31 March. As further explained below, she was injured by the unlawful actions identified in these pleadings that occurred during and relating to the March, including the unlawful use of pepper spray during the March.

23.     Plaintiff Ernestine Lewis Ward is an elderly Black woman and a resident of Burlington, North Carolina. She is registered to vote in Alamance County. Plaintiff Ernestine Ward has been actively involved in the Alamance County Branch of the North Carolina NAACP since the 1970s, and is a longtime community activist. She has protested police brutality and white supremacy in Graham and Alamance County and plans to continue doing so. Plaintiff Ernestine Ward attended the October 31 March and, as further explained below, was injured by the unlawful actions identified in these pleadings that occurred during and relating to the March, including the unlawful use of pepper spray during the March.

24.     Plaintiff Edith Ward is a Black resident of Burlington, North Carolina. She is registered to vote in Alamance County. Plaintiff Edith Ward attended the October 31

12

March with her mother, Plaintiff Ernestine Ward, and, as further explained below, was injured by the unlawful actions identified in these pleadings that occurred during and relating to the March, including the unlawful use of pepper spray during the March.

25.     Plaintiff Avery Harvey is a Black resident of Graham, North Carolina. He has protested police brutality and white supremacy in Graham and Alamance County and plans to continue doing so. Plaintiff Harvey attended the October 31 March. As further explained below, he was injured by the unlawful actions identified in these pleadings that occurred during and relating to the March, including the unlawful use of pepper spray during the March. Plaintiff Harvey planned to register and vote on October 31 at the Elm Street One-Stop early voting and registration site at the end of the March to the Polls, but the unlawful acts that occurred during the March kept him from doing so. Plaintiff Harvey was therefore unable to vote in the 2020 election.

26.     Ashley Reed Batten is a white resident of Hillsborough, North Carolina. She is registered to vote in Orange County. Plaintiff Batten has protested police brutality and white supremacy in Graham and Alamance County, and plans to continue doing so. She attended the March and intended to vote in Hillsborough at the end of the March. As further explained below, Plaintiff Batten was injured by the unlawful actions identified in these pleadings that occurred during and relating to the March, including the unlawful use of pepper spray during the March. As a result of the unlawful acts that occurred at the March, she was unable to vote on October 31, 2020.

13

27. Defendant Terry S. Johnson ("Defendant Johnson. "T. Johnson" or "the Sheriff") is sued in his official capacity as Sheriff of Alamance County and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Defendant Johnson is the chief law enforcement officer of Alamance County, and is responsible for the policy, practice, supervision, and implementation and conduct of Alamance County Sheriff's Office (ACSO) matters. As such, he has the authority to assign duties to sheriff's deputies and enforce local ordinances in effect throughout the county. *See* N.C. Gen. Stat. § 162-1 *et seq.*

28. At all relevant times, Defendant Johnson was acting within the scope of his employment and under color of state law.

29. Defendant Cliff Parker ("Defendant Parker") is sued in his official capacity as Chief Deputy of the ACSO and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Chief Deputy Parker is second in command to Defendant T. Johnson as law enforcement officer of Alamance County, and is responsible for implementing Defendant T. Johnson's policies and practices and supervising the conduct of ACSO deputies. As such, he has the authority to assign duties to sheriff's deputies and enforce local ordinances in effect throughout the county. *See* N.C. Gen. Stat. § 162-1 *et seq.*

30. At all relevant times, Defendant Parker was acting within the scope of his employment and under color of state law.

14

31.     Defendant Jonathan R. Franks ("Defendant Franks") is sued in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Upon information and belief, Defendant Franks is Commanding Officer of Greensboro Police Department's Special Operations Division, and was responsible for giving orders and assigning duties to ACSO's deputies and Graham Police officers on October 31, 2020. Upon information and belief, Defendant Franks has served as a consultant / trainer for other law enforcement agencies on using OC vapor, pepper spray, and similar chemical agents, as well as other unreasonable force tactics, as a method of crowd control at other racial justice demonstrations in North Carolina.

32.     At all relevant times, Defendant Franks was acting within the scope of his employment and under color of state law.

33.     Defendant Barbara Tomey ("Defendant Tomey") is sued in her official capacity as a Corporal of the Alamance County Sheriff's Office and in her individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Tomey was acting within the scope of her employment and under color of state law.

34.     Defendant Chad Martin ("Defendant Martin") is sued in his official capacity as a Lieutenant of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Martin was acting within the scope of his employment and under color of state law.

35. Defendant Daniel Nichols ("Defendant Nichols") is sued in his official capacity as a Deputy of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Nichols was acting within the scope of his employment and under color of state law.

36. Defendant James R. McClelland ("Defendant McClelland") is sued in his official capacity as a Deputy of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant McClelland was acting within the scope of his employment and under color of state law.

37. Defendant Randy Denham ("Defendant Denham") is sued in his official capacity as a Captain in the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Upon information and belief, Defendant Denham served as the Incident Commander for the ACSO on October 31, 2020, was part of the Unified Command, and was one of the individuals responsible for strategy and tactics employed by the ACSO deputies on that day. At all relevant times, Defendant Denham was acting within the scope of his employment and under color of state law.

38. Defendant David Sykes ("Defendant Sykes") is sued in his official capacity as a Captain in the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Upon

information and belief, Defendant Sykes served as the Operations Chief for the ACSO on October 31, 2020, and was one of the individuals responsible for strategy and tactics employed by the ACSO deputies on that day. At all relevant times, Defendant Sykes was acting within the scope of his employment and under color of state law.

39.     Defendant Chip Cobb ("Defendant Cobb") is sued in his official capacity as a Sergeant in the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Upon information and belief, Defendant Cobb served as the Intelligence Officer for the ACSO on October 31, 2020, and was one of the individuals responsible for strategy and tactics employed by the ACSO deputies on that day. At all relevant times, Defendant Cobb was acting within the scope of his employment and under color of state law.

40.     Defendant Peter Triolo ("Defendant Triolo") is sued in his official capacity as a Deputy of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. Upon information and belief, Defendant Triolo served as the Special Response Team Liaison on October 31, 2020, and was one of the individuals responsible for the strategy and tactics employed by ACSO deputies on that day. At all relevant times, Defendant Triolo was acting within the scope of his employment and under color of state law.

41.     Defendant John Strickland ("Defendant Strickland") is sued in his official capacity as a Deputy of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court.

17

At all relevant times, Defendant Strickland was acting within the scope of his employment and under color of state law.

42.     Defendant Mark Johnson ("Defendant M. Johnson") is sued in his official capacity as a Deputy of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant M. Johnson was acting within the scope of his employment and under color of state law.

43.     Defendant Jason Teague ("Defendant Teague") is sued in his official capacity as a Deputy of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Teague was acting within the scope of his employment and under color of state law.

44.     Defendant Mark Dockery ("Defendant Dockery") is sued in his official capacity as a Deputy of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Dockery was acting within the scope of his employment and under color of state law.

45.     Defendant Brandon Kilmer ("Defendant Kilmer") is sued in his official capacity as a Deputy of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court.

At all relevant times, Defendant Kilmer was acting within the scope of his employment and under color of state law.

46. Defendant Chandler Weger ("Defendant Weger") is sued in his official capacity as a Deputy of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Weger was acting within the scope of his employment and under color of state law.

47. Defendant James R. McVey ("Defendant McVey") is sued in his official capacity as a Sergeant of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant McVey was acting within the scope of his employment and under color of state law.

48. Defendant Taylor Hopkins ("Defendant Taylor Hopkins" or "T. Hopkins") is sued in his official capacity as a Deputy of the Alamance County Sheriff's Office and in his individual capacity, is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant T. Hopkins was acting within the scope of his employment and under color of state law.

49. Defendant City of Graham ("the City") is a municipal corporation organized under North Carolina law. *See* N.C. Gen. Stat. § 160A-11. The GPD and its police chief operate under the authority of the City. The City, acting through the GPD Chief, is responsible for the policy, practice, supervision, implementation, and conduct of all GPD

19

matters, including the appointment, training, supervision, and conduct of all GPD personnel.

50.     At all times relevant to this action, the City Manager delegated his authority to make policy related to policing and control of assemblies, marches, protests, and rallies in the City to the GPD Chief and authorized her to make final policy related to policing and control of assemblies, marches, protests, and rallies in the City.

51.     Pursuant to this delegation and City ordinance, GPD Chief was the chief policymaker for the City on matters related to policing and maintaining order related to marches, protests, rallies, and other public assemblies within the City's jurisdiction. *See* City of Graham Ordinances, Ch. 2, art. IV, div. 1, § 2-120.

52.     At all times relevant to this action, the GPD Chief possessed final authority to establish municipal policy with respect to City police conduct at such events, including the use of force by City police officers, and the timing, location, control, and containment of marches, rallies, protests, and other assemblies within the City's jurisdiction.

53.     Defendant Mary Kristine "Kristy" Cole ("Defendant Cole") is sued in her official capacity as Chief of Police for claims arising under the North Carolina Constitution, and in her individual capacity as to all other claims. Defendant Cole is domiciled in the state, and is subject to the personal jurisdiction of this Court. As Chief of Police, Defendant Cole is in charge of GPD and has final authority on the policy, practice, supervision, and implementation and conduct of GPD matters. She is in charge of assigning duties to GPD officers as she "thinks best for the good order of the city" and ensuring that

GPD officers "faithfully perform their duties." City of Graham Ordinances, Ch. 2, art. IV, div. 1, § 2-120; *see also* Ch. 2, art. IV, div. 1, § 2-126.

54.     At all relevant times, Defendant Cole was acting within the scope of her employment and under color of state law.

55.     Defendant Joaquin Velez ("Defendant Velez") is sued in his official capacity as Patrol Operations Lieutenant for the GPD for claims arising under the North Carolina Constitution, and in his individual capacity as to all other claims. He is domiciled in the state, and is subject to the personal jurisdiction of this Court. As Patrol Operations Lieutenant, Defendant Velez is responsible for patrol functions supervision, the Special Response Team, and tow inspections and management, and supervises a team of 21 GPD officers.

56.     Defendant Velez is responsible for the policy, practice, implementation, and supervision of all matters related to the GPD Patrol Division, the division responsible for first response to the events of October 31, 2020. Defendant Velez is responsible for training and supervising all GPD Patrol Division personnel, including by intervening in situations to ensure that GPD personnel obey the laws of the United States and the State of North Carolina. At all relevant times, Defendant Velez was acting within the scope of his employment and under color of state law.

57.     Defendant Duane Flood ("Defendant Flood") is sued in his official capacity as Support Services Captain for the GPD for claims arising under the North Carolina Constitution, and in his individual capacity as to all other claims. He is domiciled in the

21

state, and is subject to the personal jurisdiction of this Court. As Support Services Captain, Defendant Flood is responsible for coordination and tactics of GPD personnel, and was one of the individuals responsible for GPD tactics on October 31, 2020. At all relevant times, Defendant Flood was acting within the scope of his employment and under color of state law.

58.     Defendant Rodney King ("Defendant King") is sued in his official capacity as Assistant Chief of Police for GPD for claims arising under the North Carolina Constitution, and in his individual capacity as to all other claims. He is domiciled in the state, and is subject to the personal jurisdiction of this Court. As Assistant Chief of Police, Defendant King is second in command to Defendant Cole. He is responsible for the tactics and strategies employed by the officers under his command. At all relevant times, Defendant King was acting within the scope of his employment as Assistant Chief of Police and under color of state law.

59.     Defendant Justin Hopkins ("Defendant Justin Hopkins" or "J. Hopkins") is sued in his official capacity as a GPD officer for claims arising under the North Carolina Constitution, and in his individual capacity as to all other claims. He is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Justin Hopkins was acting within the scope of his employment as a GPD officer and under color of state law.

60.     Defendant Noah Sakin ("Defendant Sakin") is sued in his official capacity as a GPD officer for claims arising under the North Carolina Constitution, and in his

individual capacity as to all other claims. He is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Sakin was acting within the scope of his employment as a GPD officer and under color of state law.

61.     Defendant Scott Neudecker ("Defendant Neudecker") is sued in his official capacity as a GPD officer for claims arising under the North Carolina Constitution, and in his individual capacity as to all other claims. He is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Neudecker was acting within the scope of his employment as a GPD officer and under color of state law.

62.     Defendant Eric Jordan ("Defendant Jordan") is sued in his official capacity as a GPD officer for claims arising under the North Carolina Constitution, and in his individual capacity as to all other claims. He is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Jordan was acting within the scope of his employment as a GPD officer and under color of state law.

63.     Defendant Robert Parks ("Defendant Parks") is sued in his official capacity as a GPD officer for claims arising under the North Carolina Constitution, and in his individual capacity as to all other claims. He is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Parks was acting within the scope of his employment as a GPD officer and under color of state law.

64.     Defendant Joshua Payne ("Defendant Payne") is sued in his official capacity as a GPD officer for claims arising under the North Carolina Constitution, and in his individual capacity as to all other claims. He is domiciled in the state, and is subject to the

personal jurisdiction of this Court. At all relevant times, Defendant Payne was acting within the scope of his employment as a GPD officer and under color of state law.

65. Defendant John Way ("Defendant Way") is sued in his official capacity as a GPD officer for claims arising under the North Carolina Constitution, and in his individual capacity as to all other claims. He is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Way was acting within the scope of his employment as a GPD officer and under color of state law.

66. Defendant Keith Kirkman ("Defendant Kirkman") is sued in his official capacity as a GPD officer for claims arising under the North Carolina Constitution, and in his individual capacity as to all other claims. He is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Kirkman was acting within the scope of his employment as a GPD officer and under color of state law.

67. Defendant Chad Boggs ("Defendant Boggs") is sued in his official capacity as a GPD officer for claims arising under the North Carolina Constitution, and in his individual capacity as to all other claims. He is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Boggs was acting within the scope of his employment as a GPD officer and under color of state law.

68. Defendant Christopher Denny ("Defendant Denny") is sued in his official capacity as a GPD officer for claims arising under the North Carolina Constitution, and in his individual capacity as to all other claims. He is domiciled in the state, and is subject to

the personal jurisdiction of this Court. At all relevant times, Defendant Denny was acting within the scope of his employment as a GPD officer and under the color of state law.

69.     Defendant Brandon Land ("Defendant Land") is sued in his official capacity as a GPD officer for claims arising under the North Carolina Constitution, and in his individual capacity as to all other claims. He is domiciled in the state, and is subject to the personal jurisdiction of this Court. At all relevant times, Defendant Land was acting within the scope of his employment as a GPD officer and under color of state law.

## JURISDICTION AND VENUE

70.     Plaintiffs bring this action under 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and 52 U.S.C. § 10307(b) to redress the deprivation, under color of state law, of rights secured by federal law and the United States Constitution.

71.     Plaintiffs have standing to enforce these rights and all rights asserted herein.

72.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under federal law, and under 28 U.S.C. § 1343 because this action requests equitable or other relief under statutes protecting the right to vote and civil rights.

73.     This Court has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367(a) because these claims are so related to the federal law claims asserted by Plaintiffs that they are part of the same case or controversy under Article III of the U.S. Constitution.

74.     This Court has personal jurisdiction over all Defendants as they are residents of North Carolina.

75.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

76.     This Court has the authority to provide the declaratory and injunctive relief requested pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 42 U.S.C. § 1983, and 28 U.S.C. §§ 2201 and 2202.

## STATEMENT OF FACTS

### Political Expression Is Protected by Constitution and Statute

77.     The Constitution and laws of this country protect the people's right to lawfully assemble and express their political and social viewpoints, whether at the ballot box or in a public forum. *See* U.S. Const. amends. I, XIV, XV.

78.     But the right to engage in political expression has not been equally enjoyed by all. Specifically, communities of color have historically faced significant interference with these rights by both private and government actors alike, requiring both legislative and judicial intervention.

79.     Through the Ku Klux Klan Act of 1871 and Section 11(b) of the Voting Rights Act, Congress provided statutory protections against voter intimidation, harassment, and violence to protect the right to vote for all. Under these acts, invasions of physical

space and intimations of possible future violence, prosecution, or legal action based on a voter's presence at the polls constitute unlawful voter intimidation.

80.     Further, the Supreme Court has repeatedly held that the criminalization of, or law enforcement interference with, peaceful protests and demonstrations expressing "dissatisfaction with the policies of this country" infringes on "core . . . First Amendment values," even where the speakers or their viewpoints are politically unpopular or offensive. *Texas v. Johnson,* 491 U.S. 397, 411 (1989); *see also, e.g., Cox v. State of La.,* 375 U.S. 559 (1965).

## Notwithstanding Legislation and Enforcement Efforts, Official Interference with Political Expression Remains a Problem

81.     Despite significant legislation aimed at allowing people to register to vote and cast their ballot without fear of actual or attempted intimidation, threats, or coercion, efforts to intimidate voters have persisted in North Carolina and across the country.

82.     In 2000, Black voters in Florida complained about police traffic stops on Election Day, according to a report by the U.S. Commission on Civil Rights.[1] In 2010, advocates raised concerns regarding voter suppression when North Carolina police set up traffic checkpoints between primarily Black apartment complexes and polling locations.[2]

---

[1] U.S. Commission on Civil Rights, *Voting Irregularities in Florida During the 2000 Presidential Election* (2001), https://www.usccr.gov/pubs/vote2000/report/ch2.htm.

[2] Nancy McLaughlin and Joe Killian, *Dems, blacks question timing of checkpoint*, Greensboro News & Record, Nov. 2, 2010, https://greensboro.com/news/political/dems-blacks-question-timing-of-checkpoint/article_8ad13789-60e3-5520-bfb3-168dc58d5bdc.html.

As recently as 2018, voters in Georgia raised concerns of voter intimidation after police stopped groups of senior citizens on their way to the polls.[3]

83.     Within Alamance County, the October 31 March was not the first and only time that Defendant T. Johnson's deputies and Defendant Cole's officers have acted to interfere with the rights of voters in Alamance County.

84.     On October 29, organizers from Poder NC Action—a 501(c)(4) organization that promotes civic and leadership development in the Latinx community—were in Graham to canvass and provide voter education materials to community members. While parked in a Graham parking lot awaiting their canvassing assignment, the organizers— both of whom are Latinx—were questioned by an ACSO deputy about their activities. After pulling out of the parking lot, the organizers were followed by a second ACSO deputy for 20 to 30 minutes.

85.     Similarly, despite longstanding principles protecting the right to peaceful protest, demonstrations against white supremacy and police brutality have faced significant interference and violence by law enforcement in North Carolina and across the country.

86.     Outside of North Carolina, at least 68 instances of police officers escalating violence during protests in the wake of the murder of George Floyd have been captured in

---

[3] Astead Herndon, *Georgia Voting Begins Amid Accusations of Voter Suppression*, N.Y. Times, Oct. 19, 2018, https://www.nytimes.com/2018/10/19/us/politics/georgia-voter-suppression.html.

28

detail on video and reported upon by one news outlet alone.[4] Within North Carolina, law enforcement officials have followed suit. In Asheville, police were caught on video and subsequently issued an apology for destroying medical supplies and water bottles at a medic tent intended to serve anti-racist protestors.[5] In addition to Graham, officers have deployed tear gas, pepper spray, rubber bullets, and other "non-lethal" dispersal methods on anti-racist protestors in Wilmington[6], Charlotte[7], and Raleigh.[8] Whereas unarmed protestors attending demonstrations against white supremacy and police brutality have faced arrest across the state, no action was taken against protestors open-carrying firearms at numerous demonstrations for other causes.[9]

---

[4] Zipporah Osei, Mollie Simon, Moiz Syed, Lucas Waldron, *We are Tracking What Happens to Police After They Use Force on Protestors*, Pro Publica, Sept. 9, 2020, https://projects.propublica.org/protest-police-videos/.

[5] Minyvonne Burke, N.C. *police chief apologizes after video shows officers destroying medic tent set up for protestors*, NBC News, June 2. 2020, https://www.nbcnews.com/news/us-news/n-c- police-chief-apologizes-after-video-shows-officers-destroying-n1225716.

[6] Johnathan Haynes, *Tear gas: Controversial weapon used in Wilmington protests*, Star News, June 2, 2020, https://www.starnewsonline.com/story/news/2020/06/02/tear-gas-controversial- weapon-used-in-wilmington-protests/113475580/.

[7] Alison Kuznitz, Fred Clasen-Kelly, and Lauren Lindstrom, '*Wave goodbye, they're all about to get gassed*': *CMPD planned tear gas attack, video shows*, The Charlotte Observer, https://www.charlotteobserver.com/news/local/article245270810.html.

[8] Raleigh police used tear gas 252 times, city spent more than $1 million on George Floyd protests, report says, ABC 11, Sept. 15, 2020, https://abc11.com/raleigh-police-protests-george- floyd-in-may/6424640/.

[9] *See*, *e.g. Armed activists gather in support of Morganton Confederate Statue*, June 27, 2020, WBTV, https://www.wbtv.com/2020/06/27/armed-protesters-gather-support-morganton- confederate-statue/; Josh Shaffer and Andrew Carter, *Armed group marches*

29

**Plaintiffs Frequently March and Demonstrate to Advance Racial Justice and Civic Participation in Graham and Alamance County**

87.     Plaintiffs J4tNG, AA4J, Drumwright, Kee, Moore, Breeden, Jones, Ellison, Cook, Mitchell, Nesbitt, the Wards, Harvey, and Batten are actively involved in community organizing in Alamance County, including mobilizing residents on racial justice issues and voter participation through exercise of their rights to speech and assembly.

88.     Plaintiff Drumwright and others sued Defendants T. Johnson and then-Graham Police Chief Jeffrey Prichard and local elected officials on July 2, 2020, to enforce First Amendment rights to speech and assembly on the streets of Graham. *See NAACP, Alamance Branch v. Peterman, et al.,* 1:20-cv-00613- CCE-LPA, Dkt. 1, Dkt. 27. In particular, Plaintiff Drumwright and others sought to enforce their rights to speak and assemble on the grounds of the Historic Courthouse in Graham and challenged the city and county policies that prevented them from doing so.

89.     On July 6, 2020, this Court entered a Consent Temporary Restraining Order restraining certain Graham and Alamance county officials from enforcing a Graham City ordinance ("the Ordinance") that, among other things, prohibited more than two people from protesting in Graham without a permit, and prohibited minors from participating in a demonstration without the police chief's permission. *Id.,* Dkt. 15. The Court held that the plaintiffs in that action were likely to succeed on their claims that Graham's ordinance violated the First and Fourteenth Amendments of the United States Constitution. *Id.* The

---

*in downtown Raleigh to protest coronavirus stay-at-home order*, The News & Observer, May 1, 2020, https://www.newsobserver.com/news/local/article242428081.html.

Court also found that the plaintiffs in that action would suffer irreparable harm unless enforcement of the ordinance was immediately stopped. *Id.*

90.     On July 11, 2020, Plaintiff J4tNG led a peaceful march in the City of Graham to protest police brutality and white supremacy. Plaintiff Drumwright applied for, and received permission from, the City of Graham, the NC Department of Transportation, and Alamance County officials to lead the march on NC Hwy 87 from Burlington to the Confederate monument located in Graham's Historic Courthouse Square for a rally in front of the monument at the junction of North Main Street and Court Square, the rotary which circles the Historic Courthouse. Among other things, he was granted permission to erect a stage in the street and use a public address ("PA") system powered by a generator.

91.     Graham's City Council subsequently repealed the Ordinance on July 14, 2020, *NAACP, et. al. v. Peterman, et. al.,* Dkt. 27-1, and on August 14, 2020, this Court entered a preliminary injunction enjoining Alamance County officials from prohibiting all protests on many spaces in and around the Historic Courthouse. *Id.*, Dkt. 63.

92.     On or about August 21, 2020 in an attempt to respond to this Court's August 14 preliminary injunction order, Alamance County introduced a "Facility Use Policy," which laid out rules for large groups wishing to use the Historic Courthouse grounds and a permit process for reserved use.

93.     AA4J has organized marches and demonstrations to advance racial justice and civic participation and protest police brutality in the City of Graham and Alamance County since the summer of 2020. Those demonstrations were routinely disrupted or

derailed by GPD officers and/or ACSO deputies—even after this Court's August 14 preliminary injunction enjoining ACSO and the County from continuing their blanket ban on protests on the Historic Courthouse grounds.

**Plaintiffs Drumwright and J4tNG Sought and Obtained Permission from City and County Officials for the March and Attempted to Work with Officials to Ensure a Peaceful and Safe March**

94.     On October 8, 2020, Plaintiff Drumwright wrote the City of Graham to announce J4tNG's plans for a peaceful, non-partisan march to the polls focused on racial justice issues from 11 AM until 2 PM on Saturday, October 31, 2020, and to request the City's permission for the planned March.

95.     On October 11, 2020, Defendant Cole responded that, due to the City's current lack of a permitting system, Plaintiff Drumwright had to appear at the next City Council meeting to request authorization for his October 31 March plans.

96.     Plaintiff Drumwright attended the City's October 13, 2020 Council meeting to request authorization for the March. In both his October 8 letter and at the Council meeting, he explained that he intended to conduct the October 31 March as he had the July 11, 2020 event.

97.     On October 20, 2020, Reverend Drumwright also applied for and received a permit to utilize the Historic Courthouse grounds on October 31 for the rally portion of the March pursuant to Alamance County's new Facility Use Policy.

98.     As described in Plaintiff Drumwright's permit application and in various subsequent (including in-person) communications with Defendant Cole and her

32

representatives and Defendant T. Johnson's representatives between October 9 and October 30, 2020, the only logistical differences between the July 11, 2020 and October 31, 2020 events were that the October 31 March was to end at the West Elm Street Early Voting location, with the rally (including speaker presentations from a small stage using a PA system) to occur on the Historic Courthouse North entrance landing, steps, sidewalks, and pedestrian area next to the Confederate monument.

99.     Plaintiff Drumwright requested authorization to erect a stage at the end of North Main Street as he had been allowed to do on July 11, 2020, and for a short-term closure of the rotary area at the north end of the Historic Courthouse.

100.     At its October 13, 2020 meeting, the City's attorney instructed the City Council that it would not act on Plaintiff Drumwright's requests. The Council advised Plaintiff Drumwright that he must coordinate logistics for the March and rally with Defendant Cole.

101.     In addition to the written communications with Defendant Cole, Plaintiff Drumwright met with Defendant Cole in person on October 20, 2020, to discuss the route, stage, and street closure needs. Defendant Cole told Plaintiff Drumwright she would not close any streets or allow a stage as had been done on July 11, 2020.

102.     On October 24, 2020, Defendant Cole emailed Plaintiff Drumwright that she would need to increase staffing of police and fire departments for Plaintiff J4tNG's "parade" on October 31.

33

103.     On October 26, 2020, Plaintiff Drumwright wrote to Defendant Cole again about marchers' safety, and specifically raised concerns about Defendant Cole's statement that she would be increasing the police presence at the March (emphasis in original):

> Given the fact that we convened a safe march on July 11th in the same space we seek to use now, it does not seem necessary to have a large police presence on Oct 31. **We especially do not want police occupying the North landing and steps of the courthouse because that is where our rally will be.** A large police presence always seems to result in black people and anti-racist protestors getting arrested simply for standing there chanting and holding signs about justice, while neo-confederate demonstrators are allowed to be and do and say as they wish, no matter how offensive their words, gestures, or symbols. **I want to be clear that I am strongly opposed to Graham or ACSO deploying large numbers of police, particularly police in riot gear brandishing batons, tear gas and other weapons at our demonstration on Oct 31. That show of force has routinely and repeatedly resulted in harm to protestors and chilling of their First Amendment rights.** If you are aware of some identifiable threat by counter-demonstrators to our marchers which you believe necessitates large numbers of police in the court square during our march and rally, please advise immediately.

104.     Defendant Cole did not raise any concerns to Plaintiff Drumwright about violent counter-protestors, nor did she articulate why a large, armed police presence would be needed at the October 31 March.

105.     On October 28, 2020, Defendant Cole emailed Plaintiff Drumwright and his counsel, attaching GPD's "public safety plan" for the October 31 March.

106.     On October 30, 2020, Plaintiff Drumwright, with counsel present, met again with Defendant Cole, as well as Defendant T. Johnson's representatives, to try to ensure marchers' safety for the following day and to discuss the change, indicated in the "public

34

safety plan," that Defendant Cole made to the final destination of the March, which had always been planned to end at the Elm Street One-Stop Early Voting site.

107. During this meeting, Defendant Cole stated that she would not allow any street closures other than a temporary closure of North Main Street to allow marchers to safely travel from Wayman Chapel to the Historic Courthouse grounds, and refused to agree to close the North end of the traffic rotary at the Courthouse Square during the rally. She also refused to authorize set up of the stage and PA system in the same location it had been for the July 11, 2020 event.

108. The County attorney agreed that Plaintiff Drumwright could put a small stage on the Courthouse grounds.

109. At no time did Defendant Cole, Defendant T. Johnson, or their representatives, explain why armed police would be deployed or needed to manage the event.

**Plaintiffs March to Encourage Voting and Support Racial Justice**

110. On Saturday morning, October 31, 2020, a group of about 200-250 people, including Plaintiffs Drumwright, Jones, Ellison, M.E. and Z.P., Mitchell, J.A., B.A., Cook, Ernestine Ward, Harvey, Batten, Kee, Breeden, Moore, and additional members of J4tNG and AA4J gathered at Wayman Chapel AME Church in Graham for the March.

111. Defendant Cole met Plaintiffs Drumwright, Jones, Ellison, M.E. and Z.P., Mitchell, J.A., B.A., Cook, Ernestine Ward, Harvey, Batten, Kee, Breeden, Moore, and additional members of J4tNG and AA4J, as well as other participants in the March whose

35

names are unknown to Plaintiffs at this time, in the parking lot near the chapel, stated that she would be closing the street for them to march all the way to the Historic Courthouse grounds, and told them that she had State troopers there to "help close the streets," and added, "the street is yours."

112.    Using a portable PA system, Plaintiff Drumwright spoke to those assembled in front of the chapel, reminding them to spread out and keep their nose and mouth coverings on in compliance with COVID-19 social distancing protocols.

113.    The March commenced around 11:30 AM, as participants, including Plaintiffs Drumwright, Jones, Harvey, Ellison, M.E., Z.P., Mitchell, J.A., B.A., Cook, Ernestine Ward, Batten, Breeden, Moore, and additional members of J4tNG and AA4J, proceeded from Wayman's Chapel AME Church along North Main Street towards the Confederate monument that fronts the north side of the Historic Courthouse.

114.    Plaintiff Edith Ward joined the March on the way to the Historic Courthouse square.

115.    During that time, the marchers, including the Plaintiffs, were permitted to walk in the road and were escorted by Graham police, as provided in GPD's October 28, 2020 "public safety plan" and as stated by Defendant Cole in the parking lot just before the March began.

116.    When Plaintiffs and the other participants in the March peacefully passed through the intersection of Harden Street and North Main, about a block from the Confederate monument and Historic Courthouse, Plaintiff Drumwright asked them to halt

36

so that he could explain the significance of the space they were about to enter. Using his portable PA system, Plaintiff Drumwright spoke to the marchers about Wyatt Outlaw, the first Black elected city official in Graham who was lynched by white supremacists with assistance from local police in 1870. This location, which is on the northeast corner across from the Historic Courthouse, is alternatively referred to by residents as Wyatt Outlaw Park or Sesquicentennial Square.

117.    State Highway Police who were escorting the March from the rear in their patrol cars blocked North Main Street, and the GPD cars that had escorted the March from the front pulled around the Court Square and stopped near the corner of East Elm Street.

118.    The March then proceeded to the Courthouse and stopped again for approximately eight minutes of silence in symbolic remembrance of the eight minutes and 46 seconds that a police officer pinned George Floyd to the ground with a knee on his neck, murdering him.

119.    Spread out in compliance with COVID-19 protocol, the approximately 250 participants, including Plaintiffs Drumwright, Jones, Ellison, M.E., Z.P, Mitchell, J.A., B.A., Cook, the Wards, Harvey, Batten, Breeden, Moore, and additional members of J4tNG and AA4J were kneeling, standing, sitting, or lying face down in the area of North Main street and Court Square that was temporarily closed to traffic by the law enforcement vehicles.

37

**Defendants Were Stationed at Various Locations Around the Courthouse**

120.     Around this time ACSO deputies, including Defendants Tomey, Martin, Nichols, McClelland, Triolo, Weger, McVey, T. Hopkins, M. Johnson, Kilmer, Teague, Strickland, and Dockery were stationed at the Courthouse.  Most ACSO deputies were stationed at the top of the steps in front of the Courthouse's North entrance, but some were stationed inside and on top of the Courthouse.

121.     GPD officers were stationed around the Court Square.  Defendants King, Sakin, and Neudecker were part of the "Eastern GPD Team," which was a collection of GPD officers stationed in the northeastern portion of the Court Square. The remaining GPD officers, including Defendants Parks, Payne, Kirkman, Way, and Denny, were part of the "Western GPD Team" and were stationed in the Western and Northwestern portions of the Court Square.

**GPD Defendants Interrupt March and Deploy First Round of OC (Pepper) Spray**

122.     As Plaintiffs and the other marchers began their period of silence, the Eastern GPD Team quietly discussed how to deal with them.

123.     By this time, a group of counter-protesters had arrived to oppose the March and to express their support for the Confederate monument positioned prominently in front of the Historic Courthouse. Defendants Sakin and King conferred to discuss how to address these counter-protesters, with Sakin asking Defendant King, "[a]re we trying to differentiate between counter-protestors or" the marchers? Defendant King responded affirmatively, noting "[y]eah, they'll separate like oil and water."

38

124. Later, Defendant Sakin asked Defendant King, "Are we going to try to corral them in the cones?" referring to specific areas on the sidewalk. Defendant King responded, "Yes."

125. Defendant King then told the other officers on the Eastern GPD Team, "Coach them if you need to. Don't let them break the line."

126. At the end of the period of silence, Plaintiff Drumwright told the crowd to wait for a moment while he put up the stage. Plaintiff Drumwright and several J4tNG members then began erecting the small stage, including setting up J4tNG's mini PA system that Plaintiff Drumwright had been using during the March. This set up occurred on the North landing, which is the location they were instructed to use by ACSO deputies.

127. As the period of silence ended, Defendant King got on his radio and said, "Team 4 to command. We're giving orders now to clear the road."

**The First Round of Pepper Spray**

128. Officers from the Eastern GPD Team and the Western GPD Team then instructed marchers to "clear the road."

129. This message to "clear the road" contradicted the earlier message given by Defendant Cole's statements earlier that same day at Wayman Chapel AME Church, when she told the marchers, including Plaintiffs Drumwright, Jones, Ellison, M.E. and Z.P., Mitchell, J.A., B.A., Cook, Ernestine Ward, Harvey, Batten, Kee, Breeden, Moore, and additional members of J4tNG and AA4J, that she would be closing the street for them and that "the street is yours."

39

130. Participants in the March began walking toward the sidewalks on either side of the street.

131. Within 90 seconds of giving the order to hundreds of marchers to "clear the road," and without any warning, Defendant King fired the first burst of pepper spray at the crowd.

132. Defendant Neudecker turned to Defendant King and said, "Hit 'em again! Hit 'em again!"

133. Defendant King, and other officers who Plaintiffs have not been able to identify through discovery to date, sprayed the crowd again. Seconds later, Defendant King sprayed a *third* time, this time at journalists standing near the Confederate monument.

134. Plaintiff Drumwright turned from setting up the stage and alerted the GPD officers that they had just sprayed children and elderly, peaceful people.

135. Plaintiffs Jones, Cook, Mitchell, Ellison, Batten, M.E., Z.P., B.A., J.A., Harvey, Kee, Moore, and Edith Ward began to suffer the effects of the First Round of Pepper Spray, as the spray was hanging in the air.

136. Plaintiff Jones instantly felt her eyes and nostrils burning. She smelled a horrible odor from the spray. She turned and warned marchers behind her to move back.

137. Plaintiffs M.E. and Z.P., along with Plaintiff Ellison, her mother, her seventeen- and seven-year-old nieces, her nine- and four-year-old nephews, and her sister, were all hit by the First Round of Pepper Spray, experiencing burning eyes, nose and throat, confusion, and panic.

138.    Plaintiff Z.P. vomited from the spray, as did Plaintiff Ellison's sister and nephews. Plaintiff Ellison saw chaos unfolding around her as people were hit by the spray.

139.    Plaintiff Cook felt her eyes burning and started choking after experiencing the First Round of Pepper Spray. She thought she might be having a panic attack because she did not understand what was happening and thought she might die.

140.    Plaintiff Mitchell felt her eyes, nostrils, and throat burning, and began coughing after experiencing the First Round of Pepper Spray. Her five-year-old daughter, Plaintiff B.A., ran away in terror, forcing Mitchell to search for her in the chaos. Mitchell found B.A. near Sesquicentennial Square (also known as Wyatt Outlaw Park), vomiting. Plaintiff J.A., Mitchell's eleven-year-old daughter, was gagging, and at one point asked Mitchell, "Am I going to die?"

141.    Plaintiff Batten was sprayed directly during the First Round of Pepper Spray as she helped an elderly Black woman in the crowd get away from the area.

142.    Plaintiff Edith Ward was indirectly hit by this First Round of Pepper Spray. She immediately felt a burning sensation in her eyes, nose, mouth, and throat. She has long suffered from seasonal asthma, and began coughing intensely and having some difficulty breathing. After this initial spray, she moved toward the side of the crowd in order to be closer to her mother, Plaintiff Ernestine Ward.

143.    Plaintiff Harvey was hit by the First Round of Pepper Spray, and immediately felt irritation on his face and in his eyes. His breathing was also impacted.

41

144.    Plaintiff Kee was hit by the First Round of Pepper Spray while setting up the sound system. The spray entered his eyes, nose, and mouth. He felt a burning sensation in his eyes and throat.

145.    Plaintiff Moore was hit by the First Round of Pepper Spray while assisting Plaintiff Drumwright set up the stage. The spray entered his eyes, nose, and mouth. He felt a burning sensation in his throat and irritation in his eyes.

146.    Plaintiff Ernestine Ward was not directly exposed to the First Round of Pepper Spray. Before the spraying began, she had moved away from most of the crowd of marchers to minimize her potential COVID exposure and get a better view of the speakers. She did, however, see GPD officers spraying in the direction of other marchers and witnessed some of the resulting panic. She was distressed to see the officers hurting people with the spray, and felt additional trauma because she was reminded of similar tactics her generation experienced during the Civil Rights movement nearly six decades ago.

147.    Plaintiff Jasmine Breeden was not directly exposed to this First Round of Pepper Spray. She was far enough away to avoid exposure. She did, however, witness large clouds of spray rising from the area where the spraying took place, and felt panic and trauma seeing and hearing her fellow marchers in distress.

148.    Throughout the First Round of Pepper Spray, there was no traffic in the Court Square. Once the demonstrators were forcibly cleared from the streets, Defendant King radioed in to command and said, "Team 4 to command, can we open northbound traffic up?"

42

149.     At that point, Plaintiffs J4TNG's and AA4J's members and other marchers who had been at the Wyatt Outlaw Park tried to use the crosswalk to get to the courthouse grounds despite the chaos created by the First Round of Pepper Spray.

150.     Plaintiff Drumwright stepped down from the stage to attempt to de-escalate the situation and make sure the J4tNG members and marchers could cross the street and get to the Courthouse grounds. Plaintiff Drumwright then began the rally.

**Plaintiff Harvey Is Arrested During the March**

151.     Shortly after Plaintiff Drumwright began the rally portion of the March, Defendant Jordan, Defendant Boggs, and Defendant Justin Hopkins pulled a 63-year-old individual out of the crowd and arrested him. The officers did not explain to the individual why he was arrested. One minute later, Defendant Jordan pulled a second, even older individual out of the crowd and arrested him. Plaintiffs Ward, Nesbitt and Mitchell witnessed the arrests.

152.     During the first several speakers at the rally, Plaintiff Harvey escorted another March participant who was suffering from the effects of the GPD officer's First Round of Pepper Spray from the Courthouse grounds to the Verdict, a restaurant near the corner of West Elm and Northwest Court Square. Plaintiff Harvey ordered some food and drink from the Verdict and, while waiting for the order on the sidewalk in front of the restaurant, listened to the speakers.

153.     Defendant Jordan, Defendant Payne, and Defendant Boggs approached Plaintiff Harvey and told him to move to the "designated area."

43

154.    Plaintiff Harvey and other individuals informed Defendant Jordan that they were customers at the restaurant. Defendant Jordan responded, "Well go inside then, 'cause you haven't went in at all. But if you want to get technical, I'll just arrest you, okay? Cause you are not in your designated spot, it's just that simple."

155.    Plaintiff Harvey explained that he was waiting on his food. He then turned away and started walking toward the door of the Verdict and said "I'm going to get some food."

156.    Despite Plaintiff Harvey's compliance with Defendant Jordan's order to "go inside" the restaurant, and his explicit statements that he was waiting for the food he had ordered, Defendant Jordan arrested Plaintiff Harvey.

157.    Defendant Jordan and Defendant Payne escorted Plaintiff Harvey to the southwestern corner of the Court Square. Plaintiff Harvey asked, "What are you arresting me for, Officer Jordan?" Defendant Jordan responded, "You were not in your designated spot." They were followed by Defendant Velez.

158.    Plaintiff Harvey asked Defendant Payne, "Why are y'all messing with me?" Defendant Payne responded, "Right now—you were being told to get back over to the designated area for the protest." Plaintiff Harvey replied, "I'm not . . . I'm eating. I'm in front of the Verdict."

159.    When the squad car arrived, Defendant Payne told the driver that Plaintiff Harvey was under arrest for failure to disperse.

44

160.    On or around May 26, 2021, the charges against Plaintiff Harvey were dismissed.

**The Second Round of Pepper Spray**

161.    Upon information and belief, high-ranking Sheriff's deputies and GPD officers, including Defendants Sykes, Cobb, Flood, and Denham (collectively referred to as the "Unified Command"), observed the March from a remote location.

162.    At or around 12:55 p.m., the Unified Command ordered the ACSO deputies at the Historic Courthouse to end the rally and seize Plaintiff J4tNG's equipment.

163.    On information and belief, the Eastern and Western GPD Teams learned via their radios that ACSO deputies were being directed to disrupt the rally.

164.    Defendant Payne approached Defendant Parks and told him to retrieve a device used to deploy pepper spray.

165.    Moments later, Defendant Payne told another GPD officer that he was waiting for ACSO deputies to make their move to confiscate Plaintiff J4tNG's equipment.

166.    Just before 1:00 p.m., without giving prior warning or notice, Defendant Martin, flanked by Defendants Tomey, Nichols, Weger, and McClelland, attempted to disconnect the sound amplification system. Plaintiffs Drumwright and Kee approached these deputies to ask what they were doing.

167.    Defendant Martin grabbed Plaintiff J4tNG's generator. Plaintiffs Drumwright and Kee explained that they would voluntarily remove the generator from the Courthouse grounds, and asked that the deputies leave it alone. When Plaintiffs

Drumwright and Kee reached for their equipment, Defendants Tomey, Martin, and Nichols grabbed Plaintiffs Drumwright and Kee and other members of Plaintiff J4tNG.

168.     As Plaintiffs Drumwright and Kee tried to free themselves, Defendant Weger snatched the equipment and retreated to a line of ACSO deputies (the "ACSO Line") that had formed around the courthouse.

169.     Suddenly and with no warning or dispersal order, Defendant Tomey deployed pepper spray at the marchers who had gathered for the rally, including Plaintiffs Drumwright, Kee, and Moore. As Defendant Tomey sprayed, she tripped and fell over a curb behind her. Defendant Martin and Defendant Nichols helped her to her feet. As she stood up, Defendant Tomey sprayed pepper spray a second time. Defendants Tomey, Martin, and Nichols then retreated to the ACSO Line.

170.     Defendant T. Hopkins then approached the stage from behind. While standing on a grassy adjacent to the sidewalk, Defendant T. Hopkins deployed pepper spray straight into the air and into the crowd.

171.     After Defendant T. Hopkins sprayed pepper spray into the air, Defendants McClelland and McVey walked toward the crowd, and from the grassy area sprayed pepper spray directly at Plaintiff Moore and other J4tNG members who were standing on the sidewalk below.

172.     Plaintiff Moore felt a severe burning sensation in his eyes, nose, and throat. He was temporarily unable to breathe. The pepper spray caused his eyes to swell and feel severe pain.

46

173.    Defendants Tomey, Martin, Nichols, Weger, T. Hopkins, McVey, McClelland, and other deputies all then retreated to the ACSO Line.

174.    Plaintiffs Drumwright, Moore, Kee, and Ernestine and Edith Ward, among others who were near the stage, were hit with the pepper spray during the Second Round of Pepper Spray. Other AA4J and J4tNG members, including Plaintiff Ellison, also felt the effects of the Second Round of Pepper Spray in their eyes and noses, and tried to get themselves and others away.

175.    Plaintiff Ernestine Ward, who is elderly, was severely affected by the Second Round of Pepper Spray. She experienced a burning sensation in her eyes and throat, began having difficulty breathing, and feared for her life. Plaintiff Ernestine Ward later had to be treated by a medical doctor for damage to her respiratory system from the spray.

176.    During the Second Round of Pepper Spray, Defendants T. Hopkins, McClelland, and McVey sprayed in the direction of Plaintiff Nesbitt, who was sitting in her motorized scooter. The spray hit Plaintiff Nesbitt in her mouth, nose, and eyes, causing her extreme breathing difficulties. Plaintiff Nesbitt began seizing violently and felt like she was suffocating. Plaintiff Nesbitt fell out of her scooter.

177.    The Western GPD Team stood nearby and witnessed Defendants T. Hopkins, McClelland, and McVey pepper spray Plaintiff Nesbitt, but no officer assisted her. AA4J members carried her to get help from paramedics who were participating in the March and providing those injured by the spray with medical attention. Plaintiff Nesbitt's scooter was

47

damaged at some point in the chaos. Plaintiff Edith Ward witnessed Plaintiff Nesbitt's convulsions, and later described feeling deeply traumatized by the scene.

178.    Plaintiff Batten was standing next to Plaintiff Nesbitt during the Second Round of Pepper Spray. The spray also hit Plaintiff Batten in her mouth, nose, and eyes, causing her extreme breathing difficulties and rendering her unable to see as she tried to assist Plaintiff Nesbitt.

179.    Plaintiff Batten was wearing contact lenses and had to receive assistance removing them to flush her eyes. A fellow marcher helped her flush her eyes, walk her to the medic cart, and then took her to the EMS station for further medical attention. Plaintiff Batten later had to be treated by a medical doctor for damage to her respiratory system from the spray.

180.    Plaintiff Breeden stood several feet away from Plaintiffs Batten and Nesbitt during the Second Round of Pepper Spray. The clouds of spray hit Plaintiff Breeden in her mouth, nose, and eyes, causing extreme breathing difficulties and pain. The spray also rendered her unable to see temporarily. Plaintiff Breeden collapsed to the ground and nearly lost consciousness. She feared for her safety. Fellow marchers helped carry Plaintiff Breeden away to help wash the spray out of her eyes.

181.    Defendant Sykes ordered Defendant Triolo to declare the March unlawful, and ordered the ACSO deputies to disperse the marchers.

182.    Approximately 11 additional ACSO deputies dressed in tactical gear with gas masks, including Defendants Triolo, Kilmer, and Dockery, joined Defendants Tomey,

48

Martin, Nichols, Weger, T. Hopkins, and McClelland on the ACSO Line. They then began shouting at marchers, including Plaintiffs Drumwright and Kee, to disperse.

**Defendant ACSO Deputies Use Physical Force to Arrest Peaceful Marchers**

183.    Most of the marchers dispersed and retreated from the pepper spray. A few remaining marchers, including Plaintiffs Drumwright and Kee, stood peacefully on the stage to exercise their First Amendment rights, which included criticizing the ACSO deputies for unlawfully and unnecessarily deploying pepper spray on peaceful marchers.

184.    Plaintiff Drumwright was arrested by Defendants Kilmer and Dockery for misdemeanor "failure to leave the premises when riotous activity was occurring," citing N.C. Gen. Stat. § 14-288.5.

185.    Plaintiff Brenden Kee was also arrested by Defendants Kilmer and Dockery, for misdemeanor failure to disperse, public disturbance, and two counts of misdemeanor resisting public officer. During the course of his arrest, Plaintiff Kee was slammed violently to the ground. Plaintiff Kee was struck in the back with a hard object, which Plaintiff Kee believed to be the deputy's firearm, causing severe bruising and sharp pain that lasted for months thereafter.

186.    At no point did Plaintiffs Drumwright or Kee act in such a way to warrant the use of such force.

**The Third Round of Pepper Spray**

187.    As more of the crowd dispersed from the Courthouse, on information and belief, the GPD officers, including Defendants Jordan, Parks, Way, Payne, Kirkman and

Denny, executed a plan devised, approved and/or ratified by Defendants Cole, Franks, Velez, Flood and King to disperse the marchers from Downtown Graham altogether by unnecessarily using pepper spray.

188.    Some GPD officers, including, but not limited to, Defendant Jordan and Defendant Parks, retrieved gas masks from their patrol cars.

189.    Upon returning from his patrol car with his gas mask, Defendant Jordan laughed and said, "Hey, stay on the gun baby. Here we go!"

190.    Some of the GPD officers on the Western GPD Team, including Defendants Jordan, Parks, Payne, Kirkman, Way, and Denny, huddled in the street north of the Courthouse and discussed a plan to start pushing the marchers out of the area.

191.    The Eastern GPD Team forced demonstrators away from the northeast corner of the Court Square. The Western GPD Team forced all of the demonstrators from the Courthouse north to Wyatt Outlaw Park.

192.    Shortly thereafter, upon information and belief, Defendant Flood authorized GPD officers to deploy pepper spray on the peaceful marchers.

193.    At 1:10 p.m., Defendant Velez got on his loudspeaker in his patrol car and said, "You have five minutes to disperse. This has been declared an unlawful assembly." A few minutes later, Defendant Parks told another officer that "nobody on this side heard" Defendant Velez's command.

194.     At or around 1:14 p.m., Defendant Velez got on his loudspeaker again and told the march participants who remained that they had "three minutes" to leave Downtown Graham.

195.     One minute later, Defendant Land told Defendant Jordan, "I'm spraying. You ready?" Defendant Jordan responded, "Oh I'm ready." Defendant Land said, "I'm getting ready to hose them." Both Defendant Jordan and Defendant Land approached the crowd standing in Wyatt Outlaw Park, shaking their cans of pepper spray.

196.     Defendants Jordan, Parks, Way, Boggs, Land, and Justin Hopkins lined up at the southern edges of Wyatt Outlaw Park facing the demonstrators.

197.     Defendant Way then sprayed pepper spray at the crowd. Shortly thereafter, Defendants Jordan, Parks, Land, Boggs, and Justin Hopkins also started spraying pepper spray.

198.     As many marchers, including Plaintiffs Cook, Ellison, Mitchell, and the Wards, attempted to disperse, they were chased and repeatedly pepper-sprayed by GPD officers, including Defendants Way, Parks, Land, Boggs and J. Hopkins.

199.     The remaining marchers tried walking northbound on Main Street in compliance with the GPD officers' orders. As they walked, Defendant Jordan circled around to the right side of the group and sprayed more pepper spray into the air at the crowd. Defendant Neudecker also deployed pepper spray at the crowd.

200.     With the March effectively dispersed, GPD officers followed the remaining marchers as they headed north toward Harden Street.

51

201.    Despite being a ranking officer on-site and witnessing the events described above, Defendant Velez did not order any GPD officer to stop spraying pepper spray at the crowd during either the First Round of Pepper Spray, the Second Round of Pepper Spray, or the Third Round of Pepper Spray.

202.    Despite being a ranking officer on-site and witnessing the events described above, Defendant King did not order any GPD officer to stop spraying pepper spray at the crowd during either the First Round of Pepper Spray, the Second Round of Pepper Spray, or the Third Round of Pepper Spray.

203.    After the Third Round of Pepper Spray cleared the area of any remaining participants of the March, Defendant Land approached Defendant King and said, "I knew you'd spray first. I love it! I love it!" He then gave Defendant King a fist bump as Defendant King laughed.

**The Defendant GPD Officers Blocked Access to the Polling Place**

204.    During the dispersal and afterwards, GPD officers blocked off the street leading to the Elm Street early voting polling location, effectively obstructing marchers from proceeding to that polling site. These efforts were coordinated by Defendant Way.

205.    Plaintiffs Ernestine and Edith Ward attempted, along with other marchers, to flee the Third Round of Pepper Spray and get to the polling place located a block away at Elm and Maple; however, their path was blocked by GPD officers. As a result, Plaintiff Ernestine Ward and other marchers took a long route to the polling place to avoid the officers blocking their path to the polling location.

52

206.     Plaintiff Cook was able to make her way to the Elm St. early voting site and voted, despite having been pepper sprayed during the Third Round of Pepper Spray and having been intimidated from doing so by the Defendants. She was coughing and feeling pain from the pepper spray as she traveled.

**Defendant ACSO Deputies Continued to Unlawfully Arrest the Plaintiffs**

207.     After Plaintiff Cook voted, she walked to the Alamance County Detention Center to check on friends who had been arrested during the March.

208.     ACSO deputies and GPD officers, including Defendant Way, warned Plaintiff Cook to stay on the grass median between the parking lot of the Detention Center and the street or she would also be arrested.

209.     Using a megaphone but remaining on the grass, Plaintiff Cook began singing "We're Ready for Change."

210.     After a few minutes, approximately seven of ACSO deputies, including Defendants Strickland, M. Johnson and Teague, arrested Plaintiff Cook without warning, as ordered by Defendant Parker. She was detained for several hours, eventually released with a misdemeanor charge for "inciting a riot." The Alamance County District Court dismissed that charge on or about September 1, 2021.

**The Defendants Did Not Use The Same Amount of Force Against Counter-Demonstrators**

211.     Throughout the entire October 31 March, people holding Confederate battle flags and/or wearing neo-confederate symbols acted as counter-demonstrators, standing by on the Eastern corners of East Elm St. and Court Square.

212.     Once the March was improperly declared an unlawful assembly, some of the officers on the Eastern GPD Team approached the group of counter-demonstrators and told them that they had to leave the Downtown area.

213.     The counterdemonstrators refused no less than four commands to leave the area by the Eastern GPD Team. Nevertheless, the Eastern GPD Team did not touch or arrest them.

214.     Following the March, one of the counter-demonstrators reported that he and his fellow counter-demonstrators had been given advance warning by law enforcement agents at the March to move away from the square while the rally at the Courthouse was taking place, and after seeing the repeated deployment of pepper spray against the marchers, the counter-demonstrator understood why they had been forewarned.

**The Force Used Against Plaintiffs Was Not Reasonable**

215.     At all times during and following the March, Plaintiffs and members of Plaintiff organizations J4tNG and AA4J remained peaceful.

216.     Because of the acts described above, the planned March to the Polls was abruptly terminated. Some voters, including Plaintiffs Jones and Batten, were actually

54

deterred from voting on October 31, 2020. Because of their pepper spray-related injuries, they could not go to the polls that day as intended. Plaintiff Harvey could not vote at all in the 2020 election because he was pepper-sprayed and wrongfully arrested during the March.

217.    On November 3, 2020, Election Day, Plaintiff J4tNG members and Plaintiff Drumwright were leading a second, peaceful march to the polls to complete the March's objective that had been thwarted on October 31, 2020.

218.    As they passed, Plaintiff Drumwright encouraged marchers who had not yet voted to stop and do so. Plaintiff Jones, who was prevented from voting on October 31, 2020 due to having been unlawfully pepper-sprayed during the March, stopped at the polling site to vote.

219.    Approximately four GPD officers were prominently stationed at the Graham Community Center polling place at the same time the marchers approached. Voters wishing to enter the polling place had to walk through or closely around this group of GPD officers to reach the doors of the polling place.

220.    The presence of GPD officers in front of and inside the polling place intimidated Plaintiff Jones, given that she had been unlawfully pepper-sprayed by law enforcement officers during the March. An Elon University student agreed to accompany Plaintiff Jones into the polling location to help alleviate her fear of the officers.

**Defendants' Conduct Intimidated Voters in the Exercise of their Fundamental Right to Vote**

221.    Plaintiff J4tNG has members who are lawfully registered voters in Alamance County, who attended the March, and were similarly intimidated from voting by the violent actions of Defendants King, Jordan, Payne, Way, Kirkman, Tomey, Martin, Nichols, McClelland, Triolo, McVey, T. Hopkins, J. Hopkins, M. Johnson, Kilmer, Teague, Strickland, and Mark Dockery. These wrongful actions were planned, approved, and/or ratified by Defendants Cole, Velez, Franks, Terry Jonson, Parker, Sykes, Flood, Cobb, and Denham. Other members of Plaintiff J4tNG experienced both intimidation and an attempt to intimidate, threaten, and coerce such that they were prevented or may be prevented in the future from exercising their right to vote or from urging or aiding others to vote.

222.    Plaintiff AA4J has members who are lawfully registered voters in Alamance County who attended the March and were similarly intimidated from voting by the violent actions of Defendants King, Jordan, Payne, Way, Kirkman, Tomey, Martin, Nichols, McClelland, Triolo, McVey, T. Hopkins, J. Hopkins, M. Johnson, Kilmer, Teague, Strickland, and Mark Dockery. These wrongful actions were planned, approved, and/or ratified by Defendants Cole, Velez, Franks, Terry Johnson, Parker, Sykes, Flood, Cobb, and Denham. Other members of Plaintiff AA4J experienced both intimidation and an attempt to intimidate, threaten, and coerce such that they were prevented or may be prevented in the future from exercising their right to vote or from urging or aiding others to vote.

56

223. Defendants Cole, Parker, Franks, Velez, Terry Johnson, Denham, Cobb, Sykes, and Flood acted in concert to plan, direct, authorize, and approve the violent crowd control tactics employed by GPD officers and ACSO deputies against Plaintiffs peacefully marching to the polls. Indeed, Defendant Velez announced during the March that "everybody out here," referring to the GPD officers, "works for me."

224. The actions of each Defendant described in the paragraphs above constitute an attempt to intimidate, threaten, and coerce the Individual Plaintiffs and members of Plaintiffs AA4J and J4tNG who are Alamance County voters, from participating in the election in a manner that prevents them from exercising their constitutional right to vote and from encouraging others to do so.

225. Defendants Terry Johnson, Cole, and the City of Graham have insisted through spokespersons that their deputies' and officers' violent actions were appropriate and justified because of alleged violations of the Alamance County Facility Use permit and/or permissions granted by Defendant Cole for the October 31 March. This is not so.

226. Moreover, the Defendant deputies' and officers' violent actions, including the use of pepper spray, yelling, pushing, arrests, and threats of arrest, are themselves inconsistent with the enforcement provisions of the Facility Use Policy, the stated intent of which is "to deescalate and secure compliance," noting that "[e]nforcement should be at a last resort."

227. The Facility Use Policy states that "[v]iolators will be provided an explanation as to the violation of law being committed and requested to refrain from

57

continuing the conduct or relocate," and indicates that a written warning should be issued for any violation prior to an arrest.

228.    No explanations of any violations being committed were provided, nor were any written warnings issued, before any deployment of pepper spray occurred during the March.

229.    Further, nothing during the March justified the use of pepper spray against any Plaintiff, much less the widespread and indiscriminate use of pepper spray against entirely peaceful marchers, including children and the elderly.

230.    The violent suppression of Plaintiffs' rights to assemble for a march to the polls constitutes an attempt to intimidate, threaten, and coerce voters such as Individual Plaintiffs Jones, Cook, Batten, Harvey, and Organizational Plaintiffs J4tNG and AA4J members in an attempt to prevent and discourage them from exercising their right to vote.

231.    The above-referenced conduct violates Section 11(b) of the Voting Rights Act, the Ku Klux Klan Act, and the First and Fourteenth Amendments. These violations have caused Individual Plaintiffs—as well as Plaintiffs J4tNG and AA4J and their members—irreparable harm.

232.    The actions described above violated Plaintiffs' clearly established rights, of which a reasonable person would have known.

**Defendants' Conduct Injured and Chilled Voters and Others in the Exercise of their First Amendment Rights**

233.    As a result of the unlawful actions discussed above, Plaintiffs have suffered injuries entitling them to damages, including significant physical, emotional, and mental pain and suffering.

234.    Individual Plaintiffs and members of J4tNG and AA4J intend to participate in future non-violent protests in Graham, including in the Historic Courthouse area.

235.    Because of the violent response of ACSO and City officials, fewer persons will likely attend such events in the future out of fear that law enforcement officers will harm them. Parents will be discouraged from bringing their children even to public assemblies advertised as peaceful, and where the organizers have obtained permit, limiting these parents' ability to teach their children about values and issues that are important to them, and limiting their own ability to attend if they cannot arrange for childcare. Senior citizens and people with disabilities will be discouraged from participation in future gatherings, because their safety is particularly threatened by Defendants' violent crowd control tactics.

236.    Defendants' actions, described in the foregoing paragraphs, were not a reasonable regulation of the time, place, or manner of Plaintiffs' First Amendment protected activity. These actions were not justified by a compelling—or even substantial—government interest.

59

237.    The actions and inactions of Defendants described in the foregoing paragraphs had the effect of denying people the ability to peaceably assemble, march, vote, and protest. They also represent seizure and objectively unreasonable uses of force.

238.    Individual Plaintiffs, Organizational Plaintiffs, and their members are suffering continuing harm in that they are threatened with objectively unreasonable use of force by Defendants in the future.

**Absent Injunctive Relief Plaintiffs Will Continue to be Harmed by Defendants' Conduct**

239.    Defendants have demonstrated continued hostility to Plaintiffs' attempts to participate in non-violent protests and otherwise exercise their First Amendment rights since the October 31 March.

240.    For example, AA4J and its members organized and participated in a peaceful demonstration in front of the Historic Courthouse in Graham on November 16, 2020. When AA4J members peacefully attempted to attend and offer public comment at the meeting of the Alamance County Board of Commissioners ("BOC") held in the Historic Courthouse, Defendants Johnson and ACSO deputies again used excessive force against AA4J members—intimidating and harassing them, and later physically and emotionally injuring some of them during their unlawful arrests as they were leaving the BOC meeting.

241.    Further, in mid-November, 2020 during which time Plaintiffs Drumwright and J4tNG continued attempts to organize peaceful demonstrations in Alamance County, Defendant Terry Johnson charged Plaintiff Drumwright with two felonies and additional misdemeanors related to his participation in the March to the Polls.

60

## CAUSES OF ACTION

**Count I:     Violation of the First Amendment (All Plaintiffs against all Defendants)**

242.    Plaintiffs incorporate Paragraphs 1 through 241 as if fully set forth in this claim.

243.    Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violation of the free expression, free association, and assembly rights protected under the First and Fourteenth Amendments to the U.S. Constitution. Plaintiffs J4tNG and AA4J assert this claim on behalf of themselves and their members.

244.    In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

245.    As described above, Defendants' activities to restrict and suppress Plaintiffs' speech and assembly at the October 31, 2020 March to the Polls violated Plaintiffs' First Amendment rights to free speech, and Plaintiffs' First Amendment rights to freedom of assembly and association. These activities include the actions taken by Defendants King, Jordan, Parks, J. Hopkins, Payne, Way, Land, Denny, Sakin, Kirkman, Boggs, Neudeker, Tomey, Martin, Nichols, McClelland, Triolo, Weger, McVey, T. Hopkins, M. Johnson, Kilmer, Teague, Strickland, and Dockery, who responded to a peaceful march with excessive force, who unlawfully used pepper spray, who issued unlawful orders to disperse, and who improperly threatened arrests, all of which were steps taken to forcibly disperse and suppress the speech of Plaintiffs who were peacefully marching to the polls, and also include Defendants Franks, Cole, Velez, Flood, King, the City of Graham, T. Johnson,

61

Parker, Denham, Sykes, and Cobb who planned, directed, approved, and/or ratified those unlawful acts.

246. These activities also constitute unconstitutional viewpoint discrimination against Plaintiffs based on their opposition to white supremacy and police brutality, and based on their advocacy for voting, in violation of the First Amendment.

247. In addition to the damage they experienced on October 31, 2021, for which they seek monetary damages, Plaintiffs continue to be targeted for their efforts to exercise their freedom of speech, assembly, and association, warranting injunctive relief as well. For instance, (a) AA4J and its members organized and participated in a peaceful demonstration in front of the Historic Courthouse in Graham on November 16, 2020, where they were confronted by ACSO deputies, deployed by Defendant Terry Johnson, who used excessive force against AA4J members and effectuated unlawful arrests; (b) since the March to the Polls, Defendant Terry Johnson has charged Plaintiff Drumwright with additional felonies and misdemeanors for his continued efforts at organizing other peaceful demonstrations in Alamance County; and (c) Plaintiff Harvey was wrongfully arrested by ACSO deputies in April 2021 for briefly displaying a "Black Lives Matter" sign on public property, only to later have those charges dismissed.

248. The unlawful arrest of Plaintiff Harvey by Defendants Jordan and Payne, and the unlawful arrest of Plaintiff Cook by Defendants Teague, M. Johnson, and Strickland on October 31, 2020, were both conducted without a warrant or probable cause, and in

retaliation for and with intent to suppress their exercise of their rights to speech and assembly. These arrests violated Plaintiffs Harvey's and Cook's First Amendment rights.

**Count II:    Violation of the Fourth Amendment (All Plaintiffs against all Defendants)**

249.    Plaintiffs incorporate Paragraphs 1 through 241 as if fully set forth in this claim.

250.    Plaintiffs assert a claim pursuant to 42 U.S.C. § 1983 for violation of their rights against unreasonable searches and seizures protected under the Fourth and Fourteenth Amendments to the U.S. Constitution. Plaintiffs J4tNG and AA4J assert this claim on behalf of their members.

251.    In the following paragraphs, references to the Fourth Amendment include the Fourth Amendment as applied to the states through the Fourteenth Amendment.

252.    As described above, the actions taken by Defendants King, Jordan, Parks, J. Hopkins, Payne, Way, Land, Denny, Sakin, Kirkman, Boggs, Neudeker, Tomey, Martin, Nichols, McClelland, Triolo, Weger, McVey, T. Hopkins, M. Johnson, Kilmer, Teague, Strickland, and Dockery to issue unlawful and contradictory dispersal orders, to unlawfully use pepper spray on peaceful marchers, to arrest participants of the March, to threaten the arrests of participants at the March, and to forcibly disperse a peaceful march to the polls and a peaceful pro-voting rally violated Plaintiffs' rights against unreasonable seizure. And by planning, directing, approving, and/or ratifying those acts, Defendants Franks, Cole, Velez, Flood, King, the City of Graham, T. Johnson, Parker, Denham, Sykes, and Cobb also violated Plaintiffs' rights against unreasonable seizure.

63

253.     Additionally, Defendant Weger's unlawful confiscation of Plaintiff J4tNG's equipment constitutes an reasonable seizure in violation of Plaintiff J4tNG's Fourth Amendment rights.

254.     The unlawful arrest of Plaintiff Harvey by Defendants Jordan and Payne, and the unlawful arrest of Plaintiff Cook by Defendants Teague, M. Johnson, and Strickland on October 31, 2020, were both conducted without a warrant or probable cause and were unreasonable seizures that violated Plaintiffs Harvey's and Cook's Fourth Amendment rights.

**Count III:   Violation of Section 11(b) of the Voting Rights Act (All Plaintiffs against all Defendants)**

255.     Plaintiffs incorporate Paragraphs 1 through 241 as if fully set forth in this claim.

256.     The Voting Rights Act also protects against intimidation in both elections and registration efforts.

257.     Section 11(b) of the Voting Rights Act provides that:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under section 10302(a), 10305, 10306, or 10308(e) of this title or section 1973d or 1973g of Title 42.

52 U.S.C. § 10307.

258.    Defendants violated Section 11(b) of the Voting Rights Act through (i) the unlawful dispersal orders, unlawful use of pepper spray, false arrests, and improper threats to arrest committed by Defendants King, Jordan, Parks, J. Hopkins, Payne, Way, Land, Denny, Sakin, Kirkman, Boggs, Neudeker, Tomey, Martin, Nichols, McClelland, Triolo, Weger, McVey, T. Hopkins, M. Johnson, Kilmer, Teague, Strickland, and Dockery all of which occurred at the March to force the dispersal of a peaceful march to the polls and a peaceful, pro-voting rally, and (ii) the planning, direction, approval, and/or ratification of those actions by Defendants Franks, Cole, Velez, Flood, King, the City of Graham, T. Johnson, Parker, Denham, and Sykes.

259.    These actions intimidated, threatened or coerced, and/or attempted to intimidate, threaten, or coerce eligible Plaintiffs, and other Alamance County voters, concerned about racial justice issues from going to the polls, and intimidated, threatened or coerced, and/or attempted to intimidate, threaten, or coerce Plaintiffs and March participants from urging or aiding others to vote.

260.    This wrongful conduct would intimidate an objectively reasonable individual and did in fact prevent Plaintiffs Batten, Harvey, and Jones from exercising their constitutional right to vote on the last day of the early voting period.

**Count IV:   Ku Klux Klan Act of 1871 (Plaintiffs Jones, Harvey, Batten, Cook, J4tNG and AA4J against all Defendants)**

261.    Plaintiffs incorporate Paragraphs 1 through 241 as if fully set forth in this claim.

262.     Plaintiffs Jones, Cook, Harvey, Batten, and J4tNG, and AA4J, on behalf of their members, bring a claim under the second clause of 42 U.S.C. § 1985(3), which provides that:

> [I]f two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

263.     The Ku Klux Klan Act of 1871 (the "Ku Klux Klan Act") was the last of the Enforcement Acts—legislation passed during Reconstruction to protect the suffrage rights of formerly enslaved people, including by protecting them and their supporters from violence, intimidation, and harassment.

264.     The Ku Klux Klan Act provides for damages and equitable relief "if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of . . . an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy." 42 U.S.C. § 1985(3).

66

265.    The Ku Klux Klan Act provides that an action will lie against the conspirators so long as "one or more persons engaged" in the conspiracy "do, or cause to be done, any act in furtherance of the object of such conspiracy." *Id.*

266.    Even as to those persons who do not directly participate in those activities, the Ku Klux Klan Act makes it unlawful to conspire with others to promote, organize, and otherwise facilitate those efforts.

267.    Defendants violated 42 U.S.C. § 1985(3) by knowingly conspiring with each other to unlawfully disperse a march to the polls, with the purpose of discouraging and intimidating voters from exercising their constitutional right to vote.

268.    Defendants T. Johnson, Parker, Cole, Velez, and Franks, and the City's deployment of their deputies and officers and all Defendants' coordination regarding use of pepper spray, and detention and arrest of March attendees, constituted substantial steps in furtherance of the conspiracy.

269.    All Defendants knew or should have known at the time of their actions that they would prevent or deter constitutionally eligible voters like Plaintiffs Jones, Cook, Batten, Harvey, and members of Plaintiffs J4tNG and AA4J from exercising their right to vote in elections for President and members of Congress.

270.    Defendants' actions would intimidate, discourage, or prevent an objectively reasonable individual from exercising their right to vote in elections for President and members of Congress.

271.    As a result of Defendants' unlawful conspiracy, Plaintiffs Jones, Cook, Batten, Harvey, J4tNG, and AA4J have suffered damages, including significant physical, emotional, and mental pain and suffering.

**Count V:    Violation of Article I, Section 14 of the North Carolina Constitution (all Plaintiffs against all Defendants in their official capacities)**

272.    Plaintiffs incorporate Paragraphs 1 through 241 as if fully set forth in this claim.

273.    Article I, Section 14 of the North Carolina Constitution provides: "Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained, but every person shall be held responsible for their abuse."

274.    Article I, Section 14 provides at least the same level of protection for free speech as the First Amendment.

275.    The North Carolina Constitution authorizes a cause of action for damages against state officials in their official capacity when they violate the rights found in Article I, including the right to free speech. *See Corum v. Univ. of N. Carolina Through Bd. of Governors*, 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992) ("A direct action against the State for its violations of free speech is essential to the preservation of free speech.").

276.    Plaintiffs lack an adequate state common law or statutory remedy to recover for a violation of their state constitutional right to free speech.

277.    Defendants' activities to restrict and suppress Plaintiffs' speech relating to the October 31 March, including their use of unlawful dispersal orders, threats of arrest,

68

unlawful arrests, and use of pepper spray to forcibly disperse those marching to the polls, violated Plaintiffs' state constitutional right to free speech.

278. Defendants' activities also constitute unconstitutional viewpoint discrimination, in violation of the North Carolina Constitution, as these actions taken against Plaintiffs were based on Plaintiffs' opposition to white supremacy and police brutality and based on their advocacy for voting.

**Count VI: Violation of Article I, Section 12 of the North Carolina Constitution (all Plaintiffs against all Defendants in their official capacities)**

279. Plaintiffs incorporate Paragraphs 1 through 241 as if fully set forth in this claim.

280. Article I, Section 12 of the North Carolina Constitution provides: "The people have a right to assemble together to consult for their common good[.]"

281. The North Carolina Constitution provides a cause of action for damages against state officials in their official capacity when they violate the rights found in Article I. *See Corum*, 330 N.C. at 782, 413 S.E.2d at 289 ("The civil rights guaranteed by the Declaration of Rights in Article I of our Constitution are individual and personal rights entitled to protection against state action ….").

282. Plaintiffs lack an adequate state common law or statutory remedy to recover for violations of their state constitutional right to assembly.

283. Defendants' activities to restrict and suppress Plaintiffs' speech relating to the October 31 March, including their use of unlawful and contradictory dispersal orders,

threats of arrest, unlawful arrests, and use of pepper spray to forcibly disperse those marching to the polls, violated Plaintiffs' state constitutional right to free assembly.

**Count VII:** **Common Law Assault and Battery/Excessive Force (Individual Plaintiffs against Defendants Tomey, Martin, Nichols, McClelland, McVey, T. Hopkins, Kilmer, Dockery, M. Johnson, Strickland, Teague, Triolo, King, Jordan, Parks, Justin Hopkins, Payne, Way, Land, Kirkman, Boggs, and Neudeker in their individual capacities)**

284.    Plaintiffs incorporate Paragraphs 1 through 241 as if fully set forth in this claim.

285.    Defendants Tomey, Martin, Nichols, McClelland, McVey, T. Hopkins, Kilmer, Dockery, Triolo, M. Johnson, Strickland, Teague, King, Jordan, Justin Hopkins, Payne, Way, Land, Kirkman, Boggs, and Neudeker committed assault on October 31, 2020, by making a show of violence in deploying pepper spray against Individual Plaintiffs and committed battery by physically touching Individual Plaintiffs and by touching Individual Plaintiffs with pepper spray against their will.

286.    In so doing, these Defendants used an unreasonable level of force given the circumstances and acted arbitrarily and maliciously.

**Count VIII:** **Common Law False Arrest (Plaintiffs Harvey and Cook against Defendants Jordan, Strickland, M. Johnson, and Teague in their individual capacities)**

287.    Plaintiffs incorporate Paragraphs 1 through 241 as if fully set forth in this claim.

288.    Defendants Jordan and Payne committed false arrest by unreasonably, unlawfully and deliberately using force to restrain and detain Plaintiff Harvey on October 31, 2020, without legal authority for his arrest.

289.    Defendants Strickland, M. Johnson, and Teague committed false arrest by unreasonably, unlawfully and deliberately using force to restrain and detain Plaintiff Cook on October 31, 2020, without legal authority for her arrest.

290.    In so doing, Plaintiffs Harvey and Cook suffered physical injuries, for which they are each owed compensation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant the following relief:

(a)    Enter a declaratory judgment stating that Defendants' dispersal orders, use of pepper spray, threats of arrests, and arrests against peaceful marchers violated Plaintiffs' rights to free speech and assembly and against unreasonable searches and seizures under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 12 and 14 of the North Carolina Constitution, and enter an injunction prohibiting such unlawful conduct by Defendants;

(b)    Enter a declaratory judgment stating that Defendants' dispersal orders, use of pepper spray against, threats of arrests, and arrests of peaceful marchers to the polls violates the rights of Plaintiffs Jones, Cook, Harvey and Batten, and members of J4tNG and AA4J under Section 11(b) of the Voting Rights

71

Act, and 42 U.S.C. §1985, and enter an injunction prohibiting such unlawful conduct by Defendants;

(c)     Enter a declaratory judgment stating that Defendants' arrests of Plaintiffs Cook and Harvey on October 31, 2020, violated their rights to free speech and assembly and against unreasonable searches and seizures under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution and Article I, Sections 12 and 14 of the North Carolina Constitution, and enter an injunction prohibiting such unlawful conduct by Defendants;

(d)     Enter a declaratory judgment stating that the use of any and all chemical irritants against non-violent demonstrators and/or protestors is *per se* unreasonable and in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution, and Article I, Sections 12 and 14 of the North Carolina Constitution, and enter an injunction prohibiting such unlawful conduct by Defendants;

(e)     Award Plaintiffs all damages available under the law, including punitive damages;

(f)     Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1920, 42 U.S.C. § 1988, and 52 U.S.C. § 10310, and as otherwise permitted by law; and

(g)     Order such other relief as this Court deems just and equitable.

Respectfully submitted, this the 31st day of January, 2022.

/s/ Elizabeth Haddix
Elizabeth Haddix
North Carolina Bar No. 25818
ehaddix@lawyerscommittee.org

/s/ Jennifer Nwachukwu
Jennifer Nwachukwu*
Maryland Bar No. 20869
jnwachukwu@lawyerscommittee.org
Lawyers' Committee for Civil Rights
Under Law
1500 K Street N.W., Suite 900
Washington, D.C. 20005
Tel: 202-662-8300
*Notice of Special Appearance Filed

/s/Jaclyn Maffetore
Jaclyn Maffetore
North Carolina Bar No. 50849
jmaffetore@acluofnc.org
Kristi L. Graunke
North Carolina Bar. No. 51216
kgraunke@acluofnc.org

Daniel K. Siegel
North Carolina Bar No. 46397
dsiegel@acluofnc.org
ACLU of North Carolina Foundation
P.O. Box 28004
Raleigh, NC 27611-8004
Tel: 919-834-3466

Jason Keith
North Carolina Bar No. 34038
Keith & Associates, PLLC
241 Summit Avenue
Greensboro, NC 27401
Tel: 919-914-6106

/s/ Michael Bornhorst*
Michael Bornhorst*
mbornhorst@mayerbrown.com
Geoffrey Pipoly*
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
Tel: (312) 782-0600
gpipoly@mayerbrown.com
Counsel for Plaintiffs
*Notice of Special Appearance Filed